**In the Matter of the Complaint of TECO-MAR S.A., as Owner of the M/V TUXPAN for Exoneration from or Limitation of Liability.**

No. 87 Civ. 2611 (CHT).

United States District Court,
S.D. New York.

May 31, 1991.

Haight, Gardner, Poor & Havens (Chester D. Hooper, Charles B. Anderson, Christopher G. Kelley, Sloan Schickler, Edward K. Lenci, Charles L. Black, Jr., of counsel), New York City, for petitioner.

Chalos, English & Brown (Michael Chalos, Martin F. Casey, of counsel), New York City, O'Neil, Eichin, Miller & Breckinridge (Machale A. Miller, of counsel), New Orleans, La., for cargo claimants.

## OPINION

TENNEY, District Judge.

In February 1987, the M/V TUXPAN mysteriously disappeared with her crew of twenty-seven and cargo worth $22 million. She had departed from Bremen, Germany, on February 16, 1987, to travel across the North Atlantic for her destination, Vera Cruz, Mexico. However, sometime between February 24 and February 28, the ship disappeared leaving no wreckage, debris, or survivors. The owner of the TUXPAN, Tecomar, S.A. ("Tecomar") petitions this court to limit its liability pursuant to 46 U.S.C.App. §§ 181 et seq. (1988) ("Limitation Act"). The cargo claimants ("Claimants") subsequently filed claims against Tecomar pursuant to the United States Carriage of Goods by Sea Act ("COGSA"),

46 U.S.C. §§ 1300 et seq. (1982), and the International Convention for the Unification of Certain Rules Relating to Bills of Lading at Brussels on August 25, 1924 ("The Hague Rules"), and their 1968 amendments ("The Visby Amendments"), as interpreted by the laws of Germany and Belgium. For the reasons set forth below, Tecomar's petition to limit its liability pursuant to the Limitation Act is denied, as are its claims for package limitation under the Hague Rules and Visby Amendments. Claimants' claims are allowed subject to future adjudication as to exact amounts and except to the extent they are subject to a package limitation under COGSA, 46 U.S. C.App. §§ 1300 et seq. The following, including those additional facts set forth in the Discussion, constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### A. The Parties

1. The TUXPAN was owned by Tecomar, a corporation which was created in 1971 under the laws of Mexico and whose principal place of business is in Mexico City, Mexico. Pretrial Order, Joint Undisputed Facts ¶¶ 1, 21 [hereinafter PTO].

2. Claimants are comprised of 137 entities asserting 107 claims against Tecomar for damages in the aggregate amount of $22,229,583.27. Id. at 2 ("Relief Prayed").

(a) Corporate and Operational Structure of Tecomar

3. Tecomar was, and still is, managed and controlled by the "Council of Presidents," which establishes the general policies of the company and gives specific management directions to the heads of the various operational and administrative departments within the corporation. Id. ¶¶ 25–26.

4. The day-to-day operations of Tecomar are handled by various departments within the organization, such as the Operations Department, the Technical Department, the Administrative Department, and the Insurance Department. Id. ¶ 26.

(b) Structure of Tecomar's Technical Department

5. The Technical Department is responsible for the maintenance and repair of Tecomar's vessels. *Id.* ¶ 32. The functions and procedures of this department are described in the company's "Operations Manual." *Id.* ¶ 27.

6. The Technical Department is headed by the Technical Director who has complete authority over the maintenance of all Tecomar vessels, including the power to revise vessel schedules in order to facilitate repairs. *Id.* ¶ 41. The Technical Director also has plenary authority to dry-dock the vessels, if he believes the repairs are necessary for the safety of the vessel and its crew.[1] *See id.*

7. The Technical Director reports to three vice-presidents, namely, Herman Stoldt, Carlos Viveros, and Helmut Muller. *Id.* ¶¶ 27, 40. The Director reports to Stoldt with respect to financial matters, to Muller regarding operations, and to Viveros regarding day-to-day technical matters, discipline and order of crew members, and union activities. *Id.* ¶ 39.

8. The Captains of the Tecomar vessels and their Chief Engineers report directly to the Technical Director. *Id.* ¶ 29. The day-to-day functions of the Technical Department are performed by the port engineer section, which is responsible for vessel maintenance and repair of Tecomar vessels when they are in Mexican ports. *Id.* ¶¶ 28, 33.

9. The Technical Department coordinates with the Operations Department regarding cargo operations, the maintenance of Tecomar's vessels, and the scheduling of the vessels in light of the maintenance or repairs that are required. *Id.* ¶ 31.

10. The Technical Department also coordinates with the Insurance Department regarding claims relating to Tecomar's vessels or their operations. *Id.* ¶ 30. The Insurance Department reports directly to the Council of Presidents. *Id.*

11. Tecomar's broker for hull and machinery insurance, as well as for Protection and Indemnity ("P & I") insurance, was and continues to be the Fred S. James Company, Inc. of New York. *Id.* ¶ 39.

12. Since the mid 1970s, three individuals have held the position of Technical Director: Captain Jesus Morales ("Captain Morales") (mid 1970s until October 1985); Captain Luis Perez Hernandez ("Captain Perez") (October 1985 to December 1985); and Rafael Lopez Ruiseco ("Lopez") (from December 1985 to date). *Id.* ¶ 42.

13. From late 1980 through early 1985, Lopez served as Deputy Technical Manager. *Id.* ¶ 43. Lopez's duties in this position involved assisting Captain Morales in maintaining and repairing the hull and machinery of Tecomar's vessels. *Id.* ¶ 44. During the construction of the TUXPAN, Lopez acted as one of Tecomar's representatives. *Id.* ¶ 45. For one voyage in 1982, Lopez sailed aboard the TUXPAN as chief engineer. *Id.* ¶ 46. In early 1985, Lopez left the employ of Tecomar, but was re-hired as Tecomar's Technical Director when Captain Morales' tenure ended in late 1985. *Id.* ¶ 43.

(c) Operation of Tecomar Vessels

14. Many of Tecomar's policies regarding the operations of its vessels have been memorialized in two manuals: (1) "Captain's Instructions, Part A and B" ("the Captain's Manual"), and (2) "Staff Functions and Procedures" ("the Lopez Manual").[2]

---

**1.** A dry dock is "[a]n enclosed basin into which a ship is taken for underwater cleaning and repairing. It is fitted with watertight entrance gates which when closed permit the dock to be pumped dry." R. de Kerchove, *International Maritime Dictionary* 246 (2d ed. 1961).

**2.** The Captain's Manual was authored by Captain Morales when he was Technical Director from 1980 until the early part of 1985. PTO

¶ 52. The Lopez Manual, which memorialized procedures that had been used since 1980, was written by Lopez in late 1985 and accepted by Tecomar's Council of Presidents in early 1986. *Id.* ¶¶ 53, 55. In order to facilitate compliance with these manuals, Tecomar distributed them to various personnel responsible for the operation of the vessels, e.g., the vessels' masters, chief engineers and shoreside supervisors. *Id.* ¶ 54.

15. One of Tecomar's policies requires that its vessels at sea report their noon positions on a daily basis. *Id.* ¶ 58. These reports provide the following information: the number of the telex message, the day and time the message was sent, the latitude and longitude of the vessel, the vessel's course and speed, the wind according to the Beaufort scale and the sea state according to the Douglas scale,[3] the fuel consumption, the engine revolutions per minute, and the vessel's estimated time of arrival ("ETA") at its next port of call. *Id.* ¶ 59.

16. It is also Tecomar's policy to require its captains to obtain weather reports on a regular and timely basis, and to inform the Technical Department of the daily wind and sea conditions.[4] *Id.* ¶ 115. Furthermore, Tecomar requires that the Technical Director be notified immediately of any emergency arising onboard a Tecomar vessel. *Id.* ¶ 60.

17. Since 1982, Tecomar and its vessels have participated in the United States Coast Guard's "Automated Mutual Assistance Vessel Rescue" system ("AMVER"). *Id.* ¶ 70. Pursuant to the rules of AMVER, Tecomar vessels are requested to report their position, ETA, speed, and last encountered weather conditions directly to AMVER every forty-eight hours. *Id.*

B. *The Vessel*

18. The TUXPAN was a registered vessel of the Republic of Mexico, flying the Mexican flag, whose home port was Tuxpan, Mexico. *Id.* The ship was built in Germany by the shipyard of J.J. Sietas GmbH ("Sietas") between June 1981 and

May 1982. *Id.* ¶ 3. In May 1982, the TUXPAN was delivered by Sietas with a one year warranty.[5] *See id.* ¶¶ 3, 18.

19. Tecomar employed the following entities to assist in maintaining the TUXPAN: the engine manufacturer, Krupp Mak Maschinenbau GmbH ("MAK") to make any engine repairs in Bremen and Antwerp; the firm of Peter Donjak ("Donjak") to make any repairs to the hull or structural parts in Europe; and the shipyards of Sietas, A.G. Weser, and Motorenwerke Bremerhaven GmbH ("MWB") for other miscellaneous repairs. *Id.* ¶¶ 35, 37.

(a) Design & Construction

20. Throughout the designing and building of the TUXPAN, Tecomar employed the firm of Peter Gast ("Gast") as a supervising consultant. *Id.* ¶ 12. Gast was affiliated with a naval architectural firm, Euroluk, which also supervised construction of the TUXPAN on behalf of Tecomar. *Id.* ¶ 13. Tecomar's Technical Director and Deputy Technical Manager reviewed and discussed the building specifications with the consultants from Gast. *Id.* ¶ 16.

21. Gast stationed three of its employees at the Sietas shipyard to supervise the TUXPAN's construction. *Id.* ¶ 14. In addition, several members of Tecomar's Technical Department frequently traveled to the Sietas shipyard during the ship's construction, and spent the last month of this period aboard the vessel. *Id.* ¶ 15.

22. Both the TUXPAN and its sister ship, the M/V TUMILCO, were designed, built, and certified as ocean-going vessels for worldwide trading service. Tr. 1104; J.Exh. 3.[6] The two ships were designed

---

3. The Beaufort scale rates winds according to ascending velocity, and the Douglas scale ranks the condition of the waves and swell. R. de Kerchove, *supra,* at 52, 237–38.

4. Pursuant to the Captain's Manual, Tecomar maintains duplicate files in its offices and on its vessels with respect to the following items: (a) the technical file; (b) inspection reports; (c) daily position reports; (d) monthly reports; (e) spare parts requests; (f) the status report of navigation equipment; and (g) various other operational matters. PTO ¶ 57.

5. This warranty provided that the Sietas would repair, free of charge, all construction or design defects that were discovered within one year after the ship was delivered to Tecomar. PTO ¶ 18.

6. All citations to the trial transcript will be referred to as "Tr." and all citations to joint exhibits will be referred to as "J.Exhs." Although Petitioner's and Claimants' exhibits were received into evidence as "Plaintiff's Exhibits" and "Defendants' Exhibits," respectively, they will herein be referred to as "Pet.Exhs." and "Cl. Exhs."

with virtually identical specifications, and were built for Tecomar at the same time, for the same trade routes, and with the same materials. J. Exh. 3.

23. The customary trade route for both ships was between Mexico (Vera Cruz and Tuxpan) and Northern Europe (Antwerp and Bremen) via the United States (Houston, Texas).[7] PTO ¶ 67. A round-trip voyage at the TUXPAN's normal speed of 15.5 to 16 knots took approximately forty-two days. *Id.* ¶¶ 68, 69.

24. The winter season for the North Atlantic along this trade route is from November 1 to March 31. J. Exh. 730.

25. When designing an ocean-going vessel for worldwide service, the customary practice of ship designers is to anticipate voyages through geographical regions which will expose the vessel to the greatest structural forces. *See* J.Exh. 1327 at 7, 10, 32. Within the shipping industry, it is commonly known that a vessel will experience the heaviest weather—and thus be subjected to the greatest physical forces—during the winter season in the North Atlantic. J.Exh. 1327 at 7, 10; Tr. 334–36, 381–82, 1369–76, 91–92. One of the most severe weather phenomena of the winter North Atlantic is what is called a "meteorological bomb."[8] Such bombs often produce significant wave heights[9] of thirty to forty feet. Tr. 1367–76, 395; Cl. Exh. E. Thus, when

designing a vessel to traverse the winter North Atlantic, naval architects take into account the probability that the vessel will encounter significant wave heights of this magnitude.[10] Tr. 2006–07.

26. The TUXPAN was designed and built for the carriage of cargo packed in containers. PTO ¶ 3. The ship had three cargo holds, each with the capacity of approximately 8,350 gross tons and 4,520 net registered tons.[11] *Id.* ¶ 4.

27. The overall length of the ship was approximately 437 feet, the molded depth approximately thirty-seven feet, and the breadth approximately sixty-six feet. *Id.*

28. The main engine, built by MAK, was a medium speed diesel engine,[12] capable of producing 8,160 brake horsepower. *Id.* ¶¶ 8, 9. During the TUXPAN's construction, Tecomar requested Sietas to convert some of the ballast tanks[13] into fuel tanks, thereby enabling the ship to carry more fuel rather than taking on fuel in European ports. *Id.* ¶ 17.

29. The hatchcover system[14] for the TUXPAN was designed and built by MacGregor–Navire ("MacGregor"). *Id.* ¶ 10.

30. The TUXPAN was designed and built as a vessel called a "Type 114." *Id.* ¶ 5. All Type 114 vessels were classed by

---

7. Originally, Tecomar's shipping business consisted of service within the Gulf of Mexico between the Ports of Tuxpan, Mexico and Houston, Texas. PTO ¶ 22. Tecomar later expanded its service to trans-Atlantic carriage between ports in Mexico and Northern Europe. *Id.*

8. A meteorological bomb occurs when the barometric pressure changes at least 24 millibars within a 24–hour period. Tr. 234, 275–76, 1369. The geographical area for meteorological bombs extends from the coast of North Carolina in a northeasterly direction to approximately 35 degrees longitude. Tr. 1367–68. Over the course of one winter season, as many as 15–20 meteorological bombs can develop in the North Atlantic. *See* Tr. 1368–74; 395; Cl.Exh. E; *see also* Tr. 1437, 1479–80, 371–72; Cl.Exh. F.

9. A "significant wave height" is the average height of one-third of the highest waves for a particular time and area. PTO ¶ 124.

10. A ship which regularly travels across the North Atlantic has a one in two chance of en-

countering 40–foot significant wave heights at some point during its lifetime. Tr. 381–82, 1376.

11. The ship was designed and built to carry approximately 605 "Twenty Foot Equivalent Units" ("TEUs"), 286 of which were to be carried below deck and 319 that were to be carried on deck. PTO ¶ 7.

12. A medium speed diesel engine is technically known as 6MU 601 AK, oil 4SA, 6 Cylinders 580 X 600. PTO ¶ 8.

13. A ballast tank is a container that holds heavy material in order to maintain the ship's proper stability. R. de Kerchove, *supra,* at 36, 37.

14. A hatchcover is a cover or shutter which fits over the hatch opening in order to prevent water from entering the ship's hold. R. de Kerchove, *supra,* at 358.

the German classification society, Germanischer Lloyd ("GL"). *Id.* ¶ 6. GL classified the TUXPAN as a "100 A4E containership" with an "MC E Aut" (fully automatic engine room). *Id.*

31. As a Type 114 vessel, the TUXPAN was an open ship with extremely large hatch openings, thus making it more susceptible to torsional and transverse stresses. *See* Tr. 1890, 2454–60; Cl.Exh. Z.

32. The design of the Type 114 vessel is almost identical to that of its predecessor, the Type 113. Tr. 2482. The Type 114, however, is longer than the Type 113, and thus, is generally subject to higher levels of stress. Tr. 1896–97, 2461.

33. Prior to the creation of the Type 114 series, GL recommended several design modifications for the Type 113 series in order to reduce the stress levels on Type 113 ships.[15] *See* J.Exh. 350. However, even though both series were almost identical, Tecomar did not incorporate any of the modifications suggested for the Type 113 into the design of the TUXPAN.[16] Tr. 2461–62. In addition, Tecomar introduced a new tanktop arrangement on the TUX-PAN, which included two 90 degree discontinuities in place of the Type 113's design of gradually sloped tanktops.[17] Tr. 2473–74; *see also* Tr. 2492–94.

34. In spite of Tecomar's decision not to modify the TUXPAN's design so as to incorporate the changes suggested for the Type 113, and its decision to change the ship's tanktop arrangement, GL certified the TUXPAN as a vessel for unrestricted ocean voyage. PTO ¶ 109; J.Exh. 1222.

(b) Equipment

35. In order to obtain weather reports, the TUXPAN was equipped with a weather facsimile receiver and printer, and a telex machine. PTO ¶ 110. The reports—issued every four hours—contained updated information about the wind, wave and weather developments in the area, as well as the conditions along the anticipated route of the vessel. *Id.* ¶ 111.

36. The TUXPAN was equipped with three barometers and a barograph, enabling the crew to obtain the current barometric pressure and the history of the barometric pressure over a particular period of time. *Id.* ¶¶ 111, 112. The ship also had an anemometer that measured wind speed and direction. *Id.* ¶ 113.

37. The TUXPAN had a radio, telephone, and telegraph, all of which enabled its captain and officers to communicate with Tecomar, the Coast Guard, and other vessels within a large geographical area. *See id.* ¶ 114. Communications between the TUXPAN and Tecomar were sent through Radio Mexico and other radio stations around the world. Tr. 1098–1104.

38. The TUXPAN received weather reports from the United States National Weather Service ("the Weather Service"). The Weather Service broadcasts wind and wave conditions every six hours (at 0400, 1000, 1600 and 2200 hours Greenwich Mean

15. Specifically, GL recommended that (1) the thickness of the plating be increased, (2) the aft portion of the longitudinal bulkhead be tied into the engine room, and (3) the forward portion of the longitudinal bulkhead be tied into the crane foundation. Tr. 2480–82, 2496–503, 2472, 2489–91. The recommendations were based on a complex computer analysis of the Type 113's strength. This analysis—called a "finite element analysis"—was more thorough and detailed than the traditional empirical formulas. *See* Tr. 2034, 2039. A finite element analysis, however, was not performed for the Type 114 series. Tr. 2040.

16. Tecomar's expert on naval architecture testified that in his opinion, the TUXPAN as designed and built was sufficiently strong to with-

stand trans-Atlantic voyages, and that the cracks which later developed were not symptomatic of an overstressed ship. Tr. 1965–2006. However, most of the calculations on which he based his opinion failed to account for all the stresses and forces which a container ship such as the TUX-PAN undergoes. Tr. 2046–50; J.Exh. 711, 712. Furthermore, Tecomar's expert did not actually see most of the cracks about which he was questioned, and thus based many of his conclusions on the somewhat vague descriptions given in the ship reports. *See* Tr. 1965–88.

17. A ship's tanktop consists of the plating which forms the top part of a double bottom and the floor on which the cargo rests. R. de Kerchove, *supra,* at 823.

Time ("GMT")).[18] *Id.* ¶ 121. Each broadcast contains "synopses" describing the observed wind and waves that existed approximately four hours before the scheduled time of the broadcast. *Id.* ¶ 122, Tr. 1360. In addition, each broadcast contains a forecast of the conditions to be expected approximately 36 hours after the observations were made. PTO ¶ 123.

39. Weather is also described by weather reporting vessels, including the United States Coast Guard ("Coast Guard"), and the Global Spectral Ocean–Wave Model ("GSOWM").[19] Tr. 199–200. In addition, a NASA satellite orbiting the Earth ("GEOSAT") records actual wave heights. *Id.* The wave heights reported and forecasted by all of these sources are significant wave heights. PTO ¶¶ 124–126. Among these three sources—ship reports, GSOWM, and GEOSAT—ship reports are considered the least accurate and GEOSAT the most accurate. Tr. 299–302, 1348, 1390–93.

40. The radio station onboard the TUXPAN was operated by the ship's radio officer for at least fourteen hours per day, usually between the hours of 0800 and 2200, local time. *Id.* ¶ 107. The radio officer routinely received weather information via telex, facsimile, voice radio, radio telephone, and morse code, which he in turn relayed to the ship's Master, who was responsible for evaluating all weather reports and forecasts. *Id.* ¶¶ 108, 109, 118. Based on his evaluation of these reports and other relevant information, the Master determined the course and navigation of the ship. *Id.* at ¶ 120.

(c) Previously Experienced Weather

41. Prior to the winter of 1987, both the TUXPAN and the TUMILCO had experienced winds of at least Force 11 on the Beaufort scale and sea conditions of at least Force 8 on the Douglas scale.[20] *See* Tr. 1270–75.

42. On five separate voyages, the TUXPAN encountered winds of Beaufort Force 9–12 and seas of Douglas Force 7–8. J. Exhs. 948, 962, 965, 1000.

43. From May 1982 through July 1987, the TUMILCO experienced at least three incidents of sea states of Douglas Force 8 and two incidents of sea states of Douglas Force 9. J. Exhs. 731, 738, 739, 756, 757. On one occasion, while crossing the North Atlantic in January 1984, the TUMILCO experienced hurricane force winds (Beaufort Force 12) and "mountainous" seas of up to 66 feet (Douglas Force 9) for at least 12 hours. J.Exhs. 756, 731; Tr. 1275–76, 2387–89.

(d) Crack History

44. Both the TUXPAN and TUMILCO exhibited crack problems in their tanktops, wing tanks, deck plating and hatch covers almost immediately after they were delivered to Tecomar.[21] Many of these cracks appeared at the same time and in the same location on both ships. Tr. 2343–44, 1597; Cl.Exhs. A1, A2, A5.

45. Over the course of its five year lifetime, the TUXPAN sustained approximate-

---

**18.** Unless otherwise indicated, all times mentioned herein will be given in military hours and refer to GMT.

**19.** GSOWM is a computer model that predicts wave heights, direction, and frequency. *See* Tr. 201. The prediction—reported every three hours—is based on the computer's "hindcast," which consists of data received from ships regarding wind speed, wind direction and swell height. Tr. 299–304, 1394. Thus, the accuracy of the hindcasts is wholly dependent on the accuracy of the ship reports. Tr. 300–04. Furthermore, the predictions as to wave heights are not based on prior observations of the wave heights themselves, but rather on other phenomena such as wind speed and direction, swell heights and pressure readings. Tr. 1432.

**20.** In response to Tecomar's *in limine* motion, Magistrate Judge Gershon ruled that the crack history of the TUMILCO is relevant to whether the TUXPAN was seaworthy at the commencement of its last voyage. Order, 87 Civ. 2611 (CHT) (Aug. 10, 1990). Similarly, the weather which the TUMILCO had encountered over its lifetime is relevant to whether the storm of February 24, 1987 was expectable for the TUXPAN.

**21.** A ship's wing tanks are ballast tanks which are located outside the vessel's hull and usually under the weather deck. R. de Kerchove, *supra*, at 922. Deck plating is the material which forms the covering of the deck. *Id.* at 208.

ly 118 cracks [22] to its tanktops, wing tanks, bulkheads, shell plating, deck plating and hatch covers.[23] Tr. 2332–34, 2341, 2344–45; Cl.Exhs. A1, A2. During the same period, the TUMILCO sustained approximately 65 to 85 cracks in its tanktops, wing tanks, ballast tanks, bulkheads, shell plating, deck plating and hatch covers. Tr. 2342–44, 2347–48; Cl.Exh. A5. Many of the cracks sustained by both vessels were discovered after the entrance of water and fuel oil into their cargo holds and engine rooms while the vessels were at sea. Tr. 1571–86, 1600–33, 787–788; Cl.Exhs. B1, B6, A1, A2, A5; J. Exhs. 33, 100, 101, 108, 775.1, 776, 847.

46. The rules of GL require that a shipowner report cracks and other defects to GL's surveyors.[24] J.Exh. 913 at § 2, ¶ 4.4. GL has the facilities and expertise to determine the cause of a particular crack, whether it is serious, whether the repairs made or contemplated are proper, and whether certain phenomena (e.g., the same cracks appearing on a sister ship) require additional investigation. Tr. 810–11, 813–14, 865, 871, 902–03. Furthermore, GL provides surveyors who regularly inspect reported cracks and supervise their repair. Tr. 657–59, 663, 671, 814, 865, 873–75, 902–03; see J.Exhs. 869, 913 at § 3, ¶ 2.1.

47. If a shipowner fails to abide by GL's rules, GL has the authority to temporarily suspend the vessel's regularly scheduled service, or to permanently withdraw the vessel's classification certificate. See J.Exh. 913 at § 2, ¶ 4.5, J.Exh. 1330 at 56–58; Tr. 656, 870, 1084–87. Without a classification certificate, a shipowner cannot obtain insurance for the vessel, and thus, the vessel loses all commercial value. J. Exh. 1330 at 56–58; Tr. 1084–87.

48. GL also requires a shipowner to obtain class renewals every four to five years by submitting its ship for "special" and "continual" surveys. Tr. 615–16. The special survey is performed only at the end of the period when the ship is due for class renewal, while the continual surveys are performed throughout the classification period. Tr. 616. On the TUXPAN, the engine received continual surveys, while the hull was subject to the special survey system. *Id.*

49. The International Convention for the Safety of Life at Sea ("SOLAS"), which Mexico ratified in 1983, also requires that a shipowner report any defects or repairs made on the ship to its surveyor or other maritime authority. Ch. 1, Part B, Regs. 7(b)(ii), 11(c); Tr. 2799–2800.

50. In March 1983—approximately ten days after Sietas delivered the TUXPAN to Tecomar and while the ship was at sea— the crew discovered cracked weldings between the bulkhead of the watertight engine room and cargo hold # 3, located at a seam where the bulkhead met the top of the fuel tanks.[25] Tr. 1571–72; J.Exh. 100.

51. Tecomar discovered these cracked weldings immediately after their occurrence in May 1982, but—contrary to the

---

**22.** Tecomar contests the accuracy of Cargo's compilations regarding 15–20 of these cracks. Pet. Post-trial Brief at 64–64. Even if Tecomar's contentions are true, however, the record amply supports the fact that the TUXPAN sustained at least 100 cracks during its lifetime.

**23.** "Bulkhead" is the name given to "any verticle partition ... which separates different compartments or spaces from one another." R. de Kerchove, *supra*, at 103. The shell plating is the outer material which covers the frame of the ship. *See id.* at 718.

**24.** GL's rules specifically require that "[i]f the owners or the master of a vessel are aware of any defects, deficiencies or damages to any parts of the ship ... which are covered by classification, either [GL] or one of their repre-

sentatives will have to be advised in detail." J.Exh. 913 at § 2, ¶ 4.4. "Classification" covers "the ship's hull and machinery, including the electrical plant." *Id.* at § 1, ¶ 1.2.

**25.** On November 7, 1985, while the TUMILCO was on a voyage from Bremen to Vera Cruz, the captain discovered that a previously repaired crack along one of the ship's bulkheads had ruptured, thereby causing water to fall from the ballast tank onto the tanktop of hold # 3. Tr. 1629; J.Exhs. 753, 770. The crew attempted to pump the water out of the hold, but failed because of clogged equipment. *Id.* As a result, at least two feet of water accumulated over the course of three days while the ship was at sea. J.Exh. 856, 856.1, 856.2; Tr. 1630–31. None of these events, however, were reported to GL. Tr. 1631; J.Exhs. 856, 913 § 2, ¶ 4.4.

rules of GL—did not report them until April 1983. Tr. 1573–74, 866; J.Exh. 101. Furthermore, after inspecting the ship during its dry dock in April, GL discovered another defective welding in the portside fuel tank # 1, and concluded that the cause of the cracks was poor workmanship by Sietas. Tr. 1573–74; J.Exh. 101. Despite GL's conclusion, however, Tecomar did not inspect or investigate the condition of the remaining welds on the ship. Tr. 1574–75.

52. During the construction of the TUXPAN and TUMILCO, Gast advised Tecomar on several occasions about Sietas' poor workmanship. J.Exhs. 520–22. Moreover, before construction had commenced, Lloyd's Register informed Tecomar that Sietas' proposed design did not meet the minimum requirements for that classification society.[26] *See* Tr. 2054–57; J.Exhs. 320, 321, 322.

53. In September 1983, during an inspection of heavy weather damage to the TUXPAN's bow area, Tecomar's Technical Department discovered that four brackets[27] had not been built into the vessel, even though they appeared in the original drawings. Tr. 1563–65, 1575; J.Exh. 329 at 4–5. Despite this departure from the original construction drawings, Tecomar made no investigation to discover the possibility of other discrepencies between the drawings and the vessel as delivered. Tr. 1563–65; J.Exhs. 329, 869, 893, 894.

54. Contrary to GL's rules and regulations, Tecomar failed to inform GL that these brackets were missing, that the ves-

sel's drawings did not conform to its actual construction, and that the vessel had sustained structural damage as a result of heavy weather. Tr. 1564–65, 671–72; J.Exh. 329, 913 at § 2, ¶ 4.4.

55. In September 1984, the TUXPAN's crew discovered a crack in the weld of one of the ship's wing tanks.[28] J.Exh. 33; Tr. 1575–76. Although this crack was repaired, the ship's crew reported on November 30, 1984, that it had reopened. J. Exh. 108; Tr. 1578–80.

56. On December 1, 1984, the crew discovered that a crack in hold # 2 had caused five inches of water to accumulate inside. J.Exh. 847; Tr. 1580–81. On December 6, 1984, another crack—approximately six inches long—was found in the tanktop of that same hold. J.Exh. 775.1; Tr. 1583–1584. Furthermore, that same day, three arc-shaped cracks—each five to six inches long—were found at three different frames. J.Exh. 776; Tr. 1583–85.

57. In September and December 1984, Tecomar's Technical Director, Lopez, attempted to ascertain the cause of the cracks in the area of the tanktop by investigating the TUXPAN's double bottom tanks.[29] Tr. 1665–66. In doing so, Lopez observed that the stiffeners below each lashing point were incorrectly placed, thereby causing the containers which sat on the lashing points to crack the tanktops.[30] Tr. 1666–67; *see also* J.Exh. 317. Lopez concluded that in order to solve the cracking problem, additional stiffeners needed to be placed under the tanktop ar-

---

26. Lloyd's Register is the British classification society which Tecomar originally intended to use for the TUXPAN and TUMILCO. Tr. 1907.

27. A bracket is "[a] steel plate, usually of triangular shape, and commonly with a reinforcing flange, used to stiffen or tie beam angles to bulkheads, frames to longitudinals, or any two structural parts which meet at an angle, in order to strengthen the joint against flexure." R. de Kerchove, *supra,* at 93.

28. Depending on its location, a crack in any of the vessel's tanks can have a serious impact on the watertight integrity and stability of the ship, and thus, can also jeopardize the renewal of the

ship's class. Tr. 656, 671, 869; J. Exh. 913 at § 2, ¶ 4.5; *see also* Tr. 874, 889. Furthermore, because such cracks (as well as any crack on the vessel) can propagate, they need to be repaired as soon as they are discovered. Tr. 788.

29. The double bottom tanks are watertight compartments which may contain water ballast, fuel, or drinking water. *See* R. de Kerchove, *supra,* at 234.

30. Stiffeners are "[s]ections or shapes used for increasing the rigidity of plating." R. de Kerchove, *supra,* at 789. A lashing point is an upright post on the upper deck to which ropes for deck cargo are fastened. *Id.* at 435.

eas.[31] Tr. 1666–67; J.Exh. 317.

58. Despite Lopez's conclusions, Tecomar did not attempt to repair the cracks created by the misaligned stiffeners on the TUXPAN, even though the ship proceeded to dry dock in July 1985.[32] *See* Tr. 1675–87; J.Exhs. 45, 49, 56.

59. GL requires shipowners to report any defects or damages in a vessel's double bottom area (including tanktops, wing tanks, bulkheads and main deck areas, hatch covers, coaming [33] and closure systems). Tr. 1093–95; J.Exh. 913 at § 2, ¶ 4.4, at § 3, ¶ 2.1. Lopez, however, did not report to GL or consult with any other naval architects about these cracks.[34] Tr. 1674–75.

60. In August 1985, Tecomar observed an excessive number of cracks in the TUXPAN's hatch covers, and in the covers' stoppers, swing seals and hinges.[35] J.Exh. 356.1 (characterizing these cracks as "not a normal damage"). Shortly thereafter, Tec-

omar learned from the manufacturer, MacGregor, that the cracks were caused by the overflexibility of the ship.[36] J.Exhs. 356.1, 227; Tr. 1649–52, 2546.

61. Between 1985 and 1986, both the TUXPAN and the TUMILCO exhibited approximately 100 cracks. Cl.Exhs. A1, A2, A5; J.Exhs. 327, 515, 760, 761. In addition, many of these cracks began to propagate. J.Exhs. 317, 748, 778, 789, 794.

62. In 1986, the TUXPAN sustained at least fifty-two cracks in its wing tanks, tanktops and shell plating, some of which permitted water and oil to enter the vessel's holds.[37] Cl.Exhs. A1, A2.

63. In March 1986, Tecomar partially repaired cracks in the TUMILCO's double bottom ballast tanks # 1, # 2, and # 5, and discovered a crack in a frame corresponding to the starboard wing tank. J.Exh. 867; Tr. 1691–92. Although a GL surveyor came to inspect the ship on March 20, he

---

**31.** In December 1984, Lopez came to the same conclusion about the TUMILCO, since its stiffeners were also misaligned. Tr. 1671–72.

**32.** Although Lopez testified at trial that he intended to repair the deficient condition at the end of the TUXPAN's class period, the evidence does not support his contention. Tr. 1675–77, 1679–84, 1827–30; J. Exh. 42.1. Even assuming that he did intend to do so, this would mean that the vessel would continue to operate for an additional 15 months without notifying GL of these problems and without attempting to rectify them.

**33.** The coamings are the raised borders around the edge of hatches which prevent water on deck from running below. R. de Kerchove, *supra*, at 157.

**34.** A determination of shear stresses and their effect on the structural integrity of a vessel requires a sophisticated understanding of naval architecture. Tr. 1673–74; J. Exh. 1327 at 108–09. Lopez conducted his own investigation of the problem with the stiffeners even though he admitted that he did not possess the requisite background in naval architecture to determine what effect the misaligned stiffeners would have on the structural integrity of the vessel. Tr. 1095–96.

**35.** The TUXPAN and the TUMILCO are considered "open" or "long-hatched" vessels. Tr. 814, 876. Because such vessels flex around their horizontal and longitudinal axes, they experience greater distortions or "deflections" than do "closed" vessels. Tr. 876–878. One

particularly significant deflection is caused by torsional stresses, or twisting action, experienced by the vessel during oceanic service. Tr. 877–80. If the vessel's hatch covers are not properly designed to accommodate these expected deflections, cracks will develop in the hatch covers, stoppers, hatch cover hinges, or the swing seals. Tr. 883–85, 2506–14. If such stresses are large enough, they will cause existing cracks to propogate, and can ultimately result in a structural failure of the crack-ridden part or any of its supporting parts. *See* Tr. 2027–29, 2459–62. In addition, improperly designed hatch covers can also allow torsional stress to cause openings between the hatch covers and the coamings which in turn, will permit sea water to enter the cargo holds. Tr. 880, 888, 2596–98.

**36.** Interestingly, Tecomar had previously learned that the TUMILCO's frame had exhibited twisting and bending after several encounters with rough weather. J. Exhs. 700–02, 736, 737, 746, 751–71, 841; Tr. 1550–51.

**37.** In 1986, at least 52 cracks were also discovered in the TUMILCO's tanktops, wing tanks and main deck area. Cl. Exh. A5. The majority of the cracks were located in the areas surrounding the ballast water wing tank # 2 starboard side, double bottom tanks # 4 and # 5 port and starboard sides, and Bay 27 on deck. Cl.Exhs. A1, A2, A5. These cracks were similar in number, type, and location to the cracks found in the TUXPAN during the same period of time. Tr. 1597; Cl.Exhs. A1, A2, A5.

was not shown any of these cracked tanks, and was not informed that Tecomar had made its own repairs. Tr. 1693–94; *see* J.Exh. 867. Instead, Tecomar directed the GL inspector to test other tanks which had never exhibited any cracks, knowing that these tanks would easily pass the survey. *See* Tr. 1693–94.

64. On March 31, 1986, Tecomar discovered cracks on the TUXPAN's tanktops to holds #2 and #3. Tr. 1695–96; J.Exh. 797.

65. Three days later, on April 3, 1986, a GL surveyor came to inspect the TUXPAN in Vera Cruz. J. Exh. 327; Tr. 1696–97. Midway through the inspection, however, the surveyor told Tecomar that he would have to finish the following day. J.Exh. 327; Tr. 1698. That evening, Tecomar suddenly altered the ship's schedule: instead of remaining in Vera Cruz as was planned, the ship was ordered to travel to Tuxpan, where Tecomar attempted to repair the cracks that had been reported on March 31. J.Exh. 327; Tr. 1698–99. However, when the GL surveyor returned to complete his inspection on April 6, Tecomar did not tell him that the ship had just spent two days in Tuxpan for the purpose of repairing cracks on the tank tops. Tr. 1699. Furthermore, Tecomar also failed to inform GL of the misaligned stiffeners which Lopez had discovered in late 1984.[38] Tr. 1678–79; *see* Findings of Fact ¶ 57–58. Based on this limited information, GL issued a one-year extension for the TUXPAN's class renewal until April 1987. Tr. 1678, 615–19; J.Exhs. 294, 299, 327; *see also* J.Exh. 913 § 3, ¶ 2.1.

66. Tecomar attempted to repair cracks on the TUMILCO in a similar fashion, i.e., two days before the ship's scheduled inspection on April 30, 1986. Tr. 1700–03; J.Exh. 896.1. Knowing that the inspection would include the ship's hatchcovers and tanktops, Tecomar worked through the night of April 28 to weld the cracks in the double bottom tanks #1 and #2. Tr.

1700–03; J.Exhs. 769, 868, 896.1. Tecomar did not inform the GL inspector of these repairs, and since the cargo was loaded before April 30, he could inspect only some of the vessel's tanktops. *See* Tr. 1700–04; J.Exhs. 769.

67. On September 5, 1986, the TUXPAN's Captain reported to Tecomar that several welds had come loose in the inside area of the ship's bow panel after having encountered seas of Douglas Force 7–8. J.Exh. 230; Tr. 1705. Tecomar, however, made no attempt to investigate the cause of the loosening or the effect which it might have had on the structural integrity of the ship. Tr. 1546.

68. On October 2, 1986, Tecomar advised Donjak of the damage sustained to the TUXPAN's forecastle deck, shell plating, and various internal stiffeners, and requested an estimate as to the cost and time for the repairs.[39] Tr. 1705–06; J. Exh. 41.1. Donjak responded by advising Tecomar that he would require thirty-six to forty-eight hours to complete the requested repairs. Tr. 757, 1706–07; J. Exh. 231. Tecomar, however, advised Donjak that because of the vessel's schedule, the ship could spare only twelve to fourteen hours for the work. Tr. 757–58, 1707; J. Exh. 232.

69. After Donjak performed the repairs which could be made within fourteen hours, Tecomar called the GL surveyor at Bremen to inspect the work. *See* Tr. 805–07. However, when GL inspected the ship, Tecomar did not inform the GL surveyor of the loose welds and distorted shell plating stiffeners under the foredeck. Tr. 801, 805–07.

70. On November 18, 1986—in anticipation of an inspection by GL—Tecomar's Technical Department sent a message to the TUMILCO's master requesting information with respect to the condition of the vessel's ballast water tanks. Tr. 1708–09; J.Exh. 761. In response, the TUMILCO's master advised the Technical Department that the double bottom tank #1 could not

---

**38.** If GL had known of this problem, it probably would have prohibited the TUXPAN from traversing the North Atlantic until the problem was remedied. *See* Tr. 870.

**39.** The forecastle is a short superstructure located over the bows which is usually used for the crew's accommodation. R. de Kerchove, *supra,* at 301.

be checked because of the cargo that was stowed on top, and that the portside double bottom tank # 4 "could be entered if the crack were repaired." J. Exh. 760; Tr. 1709–10. The captain also told Tecomar that he suspected a crack in the double bottom ballast tank # 5. J.Exh. 760; Tr. 1710. After Lopez received this information, he gave the following instruction to Port Engineer Castro:

> It is not advisable that GL see that we are making repairs on tank tops. The inspections should be done when we call the inspector only to carry out tests and that no repairs are being made.

J.Exh. 761; Tr. 1710–11. Thus, although Lopez knew that Tecomar was required to report all repairs made on the ship, he again attempted to conceal cracks and repairs on the TUMILCO's tank tops. *See* Tr. 1084–87, 1093–95, 1127, 1712; J.Exh. 913 at § 2, ¶ 4.4, at § 3, ¶ 2.1.

71. On January 25, 1987, the TUXPAN's Captain reported that cracks in the hatch cover stoppers in holds # 2 and # 3 still needed repair. J.Exh. 812; Tr. 1664–65. Thus, less than a month before the TUXPAN's last voyage, the cracking problem in these parts had not been remedied. Tr. 1660; *see also* Tr. 1653–54; 1664.

72. On February 17, 1987—the day after the TUXPAN left Bremen on its last voyage—Tecomar sent a telex to the ship requesting the Chief Engineer to confirm the exact location of an existing crack in the tanktop of the portside double bottom tank # 4. Tr. 1264–67; J.Exh. 177.

73. Despite the fact that both the TUXPAN and the TUMILCO were experiencing the same cracking phenomena with their hatches, Tecomar did not report any of the cracks in the hatch covers, hinges, stoppers or swing seals to GL. Tr. 1660, 887–889; Cl.Exhs. A1, A2, A5. Furthermore, Tecomar never informed GL of MacGregor's conclusion that these cracks were caused by the overflexibility of the ship.[40] Tr. 1660; *see also* Tr. 1653–54; 1664.

(e) Engine Problems

74. Eighteen months after delivery of both the TUXPAN and the TUMILCO (in September 1983 and November 1983, respectively), Tecomar learned of several engine problems from one of its consultants, Arnesen, Christensen & Co. ("Arnesen").[41] J.Exh. 278. In addition, from April 1984 until November 1986, both vessels experienced chronic problems with the seawater and fresh water cooling systems for their main and auxiliary engines. Tr. 1128; J. Exhs. 970, 972, 21.

75. The engine problems experienced by the TUXPAN caused her crew to frequently stop its main engine while at sea. Cl. Exh. Y. Over the course of the TUXPAN's lifetime, its main engine was stopped at sea 108 times, with each stop lasting at least one hour. *Id.*

(i) *Cylinder Heads and Liners*

76. During the TUXPAN's last four months—from October 1986 to February 1987—the ship's cylinder heads and liners were continually leaking gas, thereby causing the seat of the cylinder head to erode. J.Exhs. 25, 116; *see also* Tr. 1118, 1644–45. On several occasions, this problem forced the Captain and Chief Engineer to stop the vessel's main engine while at sea.[42] J.Exhs. 237, 1004, 1005; Cl. Exh. Y.

77. In October 1986, the TUXPAN's crew had to stop the ship's engine because

---

**40.** Earlier in January 1987, Tecomar also discovered several cracks in the tanktop areas of the TUMILCO, which had been caused by a storm encountered during the ship's most recent voyage across the North Atlantic. Tr. 1552–56; J.Exh. 765. Furthermore, this storm had caused twisting and bending of the vessel's frames. J. Exh. 764; Tr. 1549–51. These damages, however, were not reported to GL. *See* Tr. 1557.

**41.** Specifically, Arnesen reported problems with the fuel oil injection piping, the lube oil pumps, the cylinder liners. J.Exh. 278.

**42.** Gas leaks through the cylinder head gaskets adversely affect the compression pressure in the combustion chamber which, especially at low speeds, can cause the engine to stop. Tr. 2275–78; 2674–78. If the main engine is stopped, the vessel will almost immediately lose its headway, and thus its ability to steer. Tr. 1316–17, 1822–26; *see also* Tr. 175.

of a problem with the turbo blower. J. Exhs. 1002, 11. As a result, the ship was adrift for approximately eight hours. J. Exhs. 1002, 11. Although these events occurred on October 21, the TUXPAN did not relay them to Tecomar until October 22, when the crew sent a telex stating that the ship had been adrift for eight hours. *See* J.Exhs. 1002, 11.

78. On November 17, 1986, the TUXPAN's Chief Engineer informed Tecomar that during some bad weather, the ship's cylinder head # 5 had "leaked through its copper gasket again," even though "[the] same cylinder head and liner has been machined by MAK twice." J. Exh. 14; *see also* Tr. 1115–16.

79. On November 24, 1986—seven days after discovering the leak from cylinder # 5—the Chief Engineer found that the seat of that cylinder had substantially eroded to the minimum allowable height. Tr. 1143; J.Exhs. 23, 24.

80. In December 1986, the TUXPAN's main engine had to be stopped because of a gas leak from the head and liner of cylinder # 3 through to the cylinder's seats. *See* Tr. 1148–52; J. Exh. 24.

81. On December 23, 1986, while the vessel was at sea, the head of cylinder # 1 had to be removed, disassembled and replaced with the spare cylinder head (which had previously been removed from cylinder # 4). Tr. 1153–55; J.Exh. 25. In order to perform the work, the main engine was stopped for the entire period, thus putting the vessel adrift for approximately nine hours. Tr. 1153–55, 1158; J.Exhs. 236, 1005. As in October 1986, the TUXPAN did not communicate with Tecomar about this problem until the next day—December 24—when the crew sent a telex stating that the ship had been adrift for nine hours.

82. On December 29, 1986, Tecomar informed MAK that the TUXPAN would arrive in Bremen on January 4, 1987, and requested that MAK repair the seat of cylinder # 1, the liner and seat of cylinder # 3, and the liner and seat of the spare cylinder. Tr. 1170–73; J.Exhs. 50, 26.1.

83. On January 4, 1987, MAK completely overhauled the spare cylinder head (which was later put into cylinder # 3) and the head of cylinder # 1, cleaned cylinder # 5, and inspected cylinder # 2. Tr. 1181–93; J.Exhs. 26.2, 57.1.

84. Cylinder heads on a ship like the TUXPAN normally need overhauling every 5,000 hours (approximately seven months of use), and the cylinder pistons require overhauling every 8,000 hours (approximately twelve months of use). Tr. 1191.

85. On February 2, 1987—during the TUXPAN's second to last voyage—the vessel suffered a breakdown in the North Atlantic, at which time the main engine was stopped and the ship was adrift for five hours. Tr. 1218–20; J.Exh. 237. As had happened on two previous occasions, the ship did not communicate with Tecomar about this matter until eight hours after the fact. *See* J. Exh. 237. The cause of the engine stoppage was a gas leak in cylinder # 3, one of the cylinders which had been completely overhauled in January, 1987. *Id.;* Findings of Fact ¶ 83. Upon completing the repair, however, the Chief Engineer was unable to restart the main engine because the starting air distributor had come loose and the starting air pistons had been "badly damaged." Tr. 1218–19; J.Exh. 237.

86. On February 4, 1987, the Chief Engineer advised Lopez that upon the vessel's expected arrival in Bremen on February 15, the seats of three cylinder heads and two cylinder liners needed to be sent ashore to be machined in the workshop. J.Exh. 238; Tr. 1220–22, 1227. These cylinders were # 2 and # 3—the same ones that had been inspected and overhauled on the vessel's prior stop at Bremen one month earlier. *See* Findings of Fact ¶ 83.

87. Prior to the TUXPAN's arrival in Bremen on February 15, Tecomar's Technical Department contacted MAK to ascertain how long the required repairs would take. Tr. 1222; J.Exhs. 69, 73. In response, MAK informed Tecomar that the work would require eighteen to twenty hours to be done properly. Tr. 1222–26; 1228–30; J.Exhs. 72, 75.

88. Tecomar, however, advised MAK and Sietas that because of "cargo compromises" the vessel would remain in Bremen for only twelve to fourteen hours. *See* J. Exhs. 72, 240, 312; Tr. 1222–26, 1248–49. Due to the brevity of this stop, therefore, Tecomar only permitted one of the cylinder liner seats to be taken ashore for repairs, and requested that the remaining liner seats be machined on the vessel using a portable grinding tool. Tr. 1222–30; J. Exh. 312.

89. MAK immediately responded and told Tecomar that the use of the requested portable grinding tool was not a proper method for making the necessary repairs, and that such a method would stop the leaking only for a short time. J. Exh. 72; *see also* Tr. 1739–41. Furthermore, there is no evidence that any of these repairs were actually made onboard the ship with the portable grinding tool or by any other method. Tr. 1249–56, 1754–1768; Cl. Exh. L.

90. During the TUXPAN's stay in Bremen, Tecomar permitted MAK to machine only the cylinder heads of the spare cylinder and of cylinder # 3. Tr. 1226–27. The TUXPAN, therefore, commenced its last voyage with unrepaired liner seats of cylinders # 2 and # 3, and to the head of cylinder # 2. Tr. 1226–28, 1247–56, 1264–1266; J. Exhs. 71, 177; Cl. Exh. L. In fact, the

day after the TUXPAN left Bremen (February 17, 1987), Tecomar sent a telex to the ship, suggesting that the ship's next drydocking include "work on the main engine liner seats and cylinder heads that still need to be repaired." [43] J. Exh. 177; Tr. 1264–67.

91. At no time were any of the problems with the cylinders reported to GL, even though its rules required a shipowner to do so.[44] Tr. 1124–28, 1157; J. Exhs. 515, 913 at § 2, ¶ 4.4.

### (ii) *Engine Foundation*

92. On December 26, 1986, the TUXPAN's crew discovered six cracks in the ship's engine foundation plate,[45] and observed that one of the bolts holding down the engine foundation was "completely loose." [46] Tr. 1159–60, 1162–63; J. Exh. 252. The TUXPAN's Chief Engineer informed Tecomar in his report to the Technical Department that the "socket wrench," [47] which was necessary to retighten the bolts, was not onboard, and that "lately maintenance hasn't been carried out." J. Exh. 252; Tr. 1160–62.

93. Lopez then sent a telex to Sietas on December 29, 1986, requesting that Sietas permanently repair the engine foundation cracks during the TUXPAN's stop at Bremen, scheduled for January 4, 1987. J. Exh. 64; Tr. 1163–64. That same day, Sietas advised Lopez that these repairs

**43.** Although Lopez testified that he saw this telex, he made no inquiry as to the reference to the outstanding work which had not yet been performed on the cylinders. Tr. 1264–67; J.Exh. 177.

**44.** Although Lopez testified that damaged cylinder heads need not be reported to GL since they are renewable parts, he nevertheless admitted that he was aware of the fact that cylinder heads are class items. Tr. 1121–24.

**45.** Similar cracks had occurred twice on the TUMILCO, once in 1983 and again in 1985. Tr. 1162; J.Exhs. 726, 914, 916.

**46.** The vessel's engine foundation plate, or bedplate, is the structure to which the main engine is secured. Tr. 2651, 2215, 2218; *see also* R. de Kerchove, *supra,* at 53. The main engine sits on the foundation plate and is aligned with the vessel's crankshaft and couplings. *See id.* The alignment of the main engine with these surrounding components is extremely sensitive, the permissable margin of error being less than

50/10,000ths of an inch. Tr. 2230–34, 2240–42; J.Exh. 122. Misalignment exceeding this limit can cause complete destruction of the engine components, which in turn, can result in engine failure. Tr. 2630, 2648, 2223. Alignment of the main engine on all three planes—the longitudinal, the transverse, and the vertical—is maintained by the engine foundation bolts which connect the engine block with the foundation plate. Tr. 2640, 2219, 2222. Thus, the engine foundation bolts must be tightened to a specific tension, as specified in the engine manufacturer's manual. J. Exh. 122; Tr. 2629, 2649, 2249.

**47.** There was some dispute at trial as to what specific tool the Chief Engineer needed. Although he requested a "socket wrench," Cargo maintained that this is commonly referred to as a "torque wrench." Tr. 1161–62. Regardless of its correct name, however, the Chief Engineer never received the instrument he requested. *See* Findings of Fact ¶ 98, *infra.*

would take approximately eight days. J. Tr. Exh. 239.

94. On December 30, 1986, Lopez sent a telex to the owner of Tecomar, informing him of the cracks in the engine foundation. J. Exh. 65; Tr. 1169–70. In this telex, Lopez also stated that he did not expect to change the ship's itinerary, and thus, "we should get an idea of the time and repairs necessary for the next dry docking." *See id.*

95. On December 31, 1986, Lopez decided that the TUXPAN's itinerary would not permit her to remain out of service for the eight days estimated by Sietas, and thus, Sietas should perform only provisional repairs during the ship's stop at Bremen on January 4. *See* J. Exh. 53; Tr. 1167–69.

96. On January 4, 1987, six different cracks were discovered in the TUXPAN's engine foundation after being examined in Bremen by representatives from Sietas, GL, and Tecomar. PTO ¶¶ 92, 93. On the same day, Tecomar had the engine foundation bolts retightened. Tr. 1196.

97. On January 9, 1987, a meeting was held at the offices of Sietas in Hamburg, Germany, to discuss the presence of the engine foundation cracks. PTO ¶ 94. This meeting was attended by representatives of Sietas, GL, and Tecomar. *Id.* At the conclusion of the meeting, Tecomar was instructed by GL to inspect the engine foundation after every trans-Atlantic voyage, and to notify GL if any of the cracks lengthened or if additional cracks developed. *Id.* ¶¶ 95, 96.

98. On January 21, 1987, Tecomar received a telex from Halls Ship Supply Co., indicating that the particular torque wrench that was needed to tighten the TUXPAN's engine foundation bolts was not available and would not be available for another thirty days. J. Exh. 262; Tr. 1196–97.

99. On January 25, 1987 (twenty-one days after the bolts had been tightened in Bremen), the bolts needed to be retightened while the ship was in Houston. J. Exh. 273; Tr. 1197. To facilitate this, Tecomar brought a torque wrench on board, but the wrench broke while being used. J. Exh. 273; Tr. 1197–98.

100. By January 27, 1987—the date on which the TUXPAN arrived in Vera Cruz— the engine foundation bolts had loosened and turned approximately sixty degrees, each bolt losing at least 50% of its required tension. J. Exhs. 55, 61; Tr. 2308. To remedy this problem, the crew had to retighten the bolts with a socket wrench that did not have a torque indicator and was not the type of wrench recommended by the engine manufacturer for this kind of job. *See* J. Exhs. 55, 61; Tr. 1201–02, 2654–57. On that same day, the crew discovered that some steel chocks[48] located between the engine foundation and the engine block had moved from their original positions, indicating that the engine had moved on its base plate. J. Exh. 61; Cl. Exhs. FF, GG; Tr. 1199–1200.

101. On February 11, 1987, Sietas responded to Tecomar's request by informing Lopez that the inspection and retightening of all the foundation bolts would take approximately eighteen hours. J. Exhs. 61, 239; Tr. 1207–11.

102. Since the TUXPAN was scheduled to remain in Bremen on February 14 for only twelve to fourteen hours, Lopez delayed all the repairs for the main engine and its foundations bolts and chocks until the vessel's next scheduled call in Bremen in March 1987.[49] J. Exh. 240; Tr. 1212–15. Thus, Tecomar did not attempt to tighten the foundation bolts while the TUXPAN was in Bremen, and no torque wrench was on board when the ship commenced its last voyage. *See* J. Exhs. 240, 262.

---

**48.** Chocks are precision-machined pieces of steel which bear the weight of the engine and keep it in alignment. Tr. 1201, 2638, 2645.

**49.** During trial, Lopez denied that he delayed these scheduled repairs until March 1987. Tr. 1213. Instead, he asserted that he had never planned any of the work to be done, and that his telex to Sietas was only an inquiry as to the cost and time required to perform the work. *See* Tr. 1213–14. However, Lopez's explanation is unpersuasive, since by his own words in the telex, he states that "planned work should be delayed up to March 25–26." J. Exh. 240.

103. On February 10, 1987, Tecomar requested the TUXPAN's crew to inspect the condition of one of the cracks in the engine foundation (at frame # 26 starboard) because that crack had exhibited some propagation. J. Exh. 274; Tr. 1235.

104. During a GL inspection of the vessel at Bremen on February 14, 1987, Lopez notified the GL inspector of an additional crack in the engine welding (between frames # 30 and # 31), but did not mention the propogation of the original cracks. J. Exh. 275; Tr. 1236–38. Lopez's failure to report the propogation violated GL's rules and regulations, as well as the direction given to Lopez by the GL surveyors in the January 9 meeting in Hamburg. J. Exh. 913 at § 2, ¶ 4.4, at § 1, ¶ 1.1.

(iii) *Seawater Cooling System*

105. From January 1985 through February 1987, both the TUXPAN and the TUMILCO exhibited recurring problems with their seawater cooling systems.[50] J. Exh. 49.1; Tr. 1128–33, 761. A breakdown in the seawater cooling system can cause the engine to overheat, which—if not immediately repaired—can ultimately lead to a loss of power resulting in a blackout. *See* Tr. 1820–22, 761–63.

106. On October 17, 1986, Donjak reported to Tecomar that he was able to punch fifteen millimeter holes in the pipes of the cooling system, and that additional repairs to the cooling system were necessary.[51] J. Exh. 235; Tr. 766–67.

107. On November 18, 1986, Tecomar's Technical Department sent a telex to Sietas requesting assistance in the installation of two new pipes for the sea water cooling system during the TUXPAN's next stop in Bremen. J. Exh. 21; Tr. 1128–29. These pipes, however, were not repaired or re-placed prior to the commencement of the TUXPAN's last voyage, thus making the vessel susceptible to a blackout. Tr. 1128–33, 2696–97; J. Exh. 21.

C. *Last Voyage of the TUXPAN*

108. On February 16, 1987, after completing the discharge and loading operations in the port of Bremen, the TUXPAN embarked for Veracruz, Mexico, giving an ETA of March 2.[52] PTO ¶¶ 72, 83; J. Exh. 97.

109. Before sailing from Bremen, the ship was loaded with 551 TEUs, weighing a total of approximately 6,727 metric tons. PTO ¶¶ 73, 75. In accordance with the stowage plan, the cargo occupied 100% of available below-deck container space and 83% of the available on-deck container space. *Id.* ¶ 74.

110. The ship's metacentric height ("GM")[53] was sufficiently stable for the intended voyage. *Id.* ¶ 80.

111. Upon sailing from Bremen on February 16, the ship reported having 851 tons of heavy fuel, 121 tons of diesel fuel, and 2,458 tons of ballast water on board. *Id.* ¶¶ 77, 78. During its call at Antwerp on February 13, the vessel loaded an additional 400 tons of heavy fuel. *Id.* ¶ 76.

112. During the course of the voyage to Vera Cruz, the TUXPAN sent daily noon position reports in compliance with Tecomar's established procedures. *Id.* ¶ 81; *see* Findings of Fact ¶¶ 14–17.

113. On February 22, an extra-tropical cyclone[54] developed off the east coast of the United States and moved in a northeasterly direction across the Atlantic ocean. Tr. 1357, 391–92. That same day, the captain of the TUXPAN changed the ship's

---

**50.** The seawater cooling system draws in water from the ocean, sends it through pipes and coils where the seawater cools the fresh-water system, which in turn cools the vessel's main and auxiliary engines. Tr. 2697–98.

**51.** These symptoms indicated an unreliable cooling system, caused either by corrosion or electrolysis. *See* Tr. 2693–97.

**52.** Unless otherwise noted, all dates mentioned hereafter refer to the year 1987.

**53.** Metacentric height is a measure of stability, consisting of the "vertical distance between the center of gravity and the longitudinal or transverse metacenter...." R. de Kerchove, *supra*, at 508.

**54.** An extra-tropical cyclone is a low pressure system which forms outside the tropics, with winds moving around the center in a counterclockwise direction. Tr. 277–78, 1358.

ETA in Vera Cruz from March 2 to March 3. PTO ¶ 83.

114. By 1200 on February 23, the barometric pressure had dropped twenty-six millibars within twenty-four hours, thereby qualifying the storm as a meteorological bomb. Tr. at 1360, 1365; J. Exh. 535, Pet. Exh. 6H.

115. The storm was accompanied by two different wind shifts, the first of which reached the TUXPAN on the morning of February 24 between 0900 and 1200. *See* Tr. 320–21; 1380–83, 1386, 1410, 1504; Cl. Exh. O. During this three-hour period, the ship experienced winds of fifty-three knots and a confused sea state. Tr. 1385–86, 1446, 1460. Sometime between 1200 and 1400, the storm's secondary wind shift passed the TUXPAN followed by more regular and unidirectional waves. Tr. 1387–89, 1444, 1462, 1469–71, 1506–07.

116. At approximately 1200 on February 24, the center of the storm was located at forty degrees north latitude, fifty-three degrees west longitude. J. Exh. 708 (telex sent at 1632, February 24 from CCGD to DISNET Weather; telex sent at 1638, February 24, from NOAA to all ships).

117. At 1530 on February 24, the TUXPAN sent its noon report to Tecomar from the location of thirty-five degrees north latitude, forty-nine degrees west longitude.[55] Tr. 1506; J. Exh. 87. The report stated that it was experiencing westerly winds of Beaufort Force 11 (fifty-six to sixty-three knots) and a westerly sea state of Douglas Force 8 (significant wave heights of thirty to forty-five feet). Tr. 1377; J. Exhs. 87, 545; PTO at ¶ 84. The ship also reported that it was navigating "with very bad weather and engine at moderate speed," and that it had reduced its speed from 13.5 knots to 4.7 knots.[56] J. Exh. 87; PTO ¶ 84.

118. Because the TUXPAN had encountered similar weather conditions many times in the past, the weather reported in the ship's 1530 report did not cause Tecomar great concern. J. Exhs. 87, 1335 at 184–85; *see* Tr. 1271.

119. On February 24, an eastward bound ship—the SELKIRK SETTLER—reported its 1500 location at approximately 200 miles west of the TUXPAN's 1530 position.[57] Tr. 1381, 296; Cl. Exh. O; J. Exhs. 589, 590. The storm had hit the SELKIRK SETTLER shortly after 0600 that morning. Tr. 294. The ship experienced the worst of the storm between 1130 and 1300, during which it encountered a maximum wind speed of fifty knots (Beaufort Force 10) and heavy swells. Tr. 134, 156, 1383; J. Exh. 545. The only damage sustained by the SELKIRK SETTLER was the destruction of its water-sensitive cargo, which comprised only one-quarter of one percent of its total cargo. Tr. 181.

120. At 1310, the SELKIRK SETTLER received an "SOS"[58] from the BALSA 24, a ship that was within ten miles of the storm's center. Tr. 149; J. Exhs. 97, 708 at 3–4. However, the SELKIRK SETTLER did not receive any communication from the TUXPAN. Tr. 297. The crew of the BALSA 24 eventually abandoned ship at approximately thirty-nine degrees north latitude, fifty-three degrees west longitude—approximately 300 miles north of the TUXPAN's 1530 position. *See* J. Exhs. 97, 708 at 3–4, 727 at 3.

121. At 1600 on February 24, a westward bound ship—the EXPORT PATRIOT—was located closer to the storm's center than the SELKIRK SETTLER, and was approximately 230 miles to the northwest of the TUXPAN's 1530 position. Tr. 54–55, 296; Pet. Exhs. 652, 1289, 589; Cl. Exhs. C10, C11. Between 0400 and 1300, the EXPORT PATRIOT had encountered the

---

**55.** This location will herein be referred to as the TUXPAN's "1530 position."

**56.** Accordingly, the captain amended the ETA in Veracruz to March 4. PTO at 16.

**57.** At 1500 on February 24, the TUXPAN was located at approximately 35 degrees north latitude, 49 degrees west longitude, whereas the SELKIRK SETTLER was located at approximately 34 degrees north latitude, 55 degrees west longitude. *See* Tr. 296; J.Exhs. 87, 589, 590.

**58.** "SOS" is the abbreviation for a distress signal. *See* R. de Kerchove, *supra,* at 672.

worst of the storm, consisting of Beaufort Force 11 winds and a significant wave height of forty to fifty feet.[59] Tr. 77–79, 1382; Pet. Exh 652; Cl. Exhs. C10, C11. Because of these weather conditions, the ship had been in constant communication with the Coast Guard, and had told with the Coast Guard that the absence of any message was equivalent to an "SOS." *See* Tr. 67–70. By 1300, the worst conditions had abated and the barometer started to rise, and by 1800, the vessel reported significant wave heights of only twenty-five feet. Tr. 73, 107; Pet. Exh. 652; Cl. Exhs. C10, C11. Although the weather caused windows of the ship's wheelhouse to shatter, there was very little damage on the stern area the vessel, and its cargo was unaffected. Tr. 60–61, 109, 111.

122. The EXPORT PATRIOT, like the SELKIRK SETTLER, received an "SOS" from the BALSA 24, but never received any message from or in regard to the TUXPAN. *See* Tr. 70–71.

123. Also at 1600 on February 24, the MINERAL HOBOKEN—located approximately 230 miles due north of the TUXPAN's 1530 position—reported winds of Beaufort Force 12 accompanied by "huge seas." J. Exh. 690. Like the SELKIRK SETTLER and the EXPORT PATRIOT, the MINERAL HOBOKEN did not receive any message from or regarding the TUXPAN. *Id.*

124. By 1800 on February 24, the center of the storm had moved directly east to approximately forty degrees north latitude, forty-seven degrees west longitude—approximately 200 miles north of the TUXPAN's 1530 position. Pet. Exh. 708 (telex sent at 2255, February 24, from NOAA to all ships). By midnight, and into the morning of February 25, the storm had moved approximately 600 miles to the northeast of the TUXPAN's 1530 position. *See* Pet. Exhs. 5C–F; Cl. Exh. C8; J. Exh. 87; Tr. 1474–76, 339.

125. Between 2328 and 2340, GEOSAT recorded significant wave heights of up to nineteen feet in the area of the TUXPAN's 1530 position, and up to twenty-nine feet in the area extending 200 miles to the east of that location. Tr. 352–54, 1413–14; J. Exh. 630; Pl.Exhs. 5D, 5E; Cl.Exh. C8. The highest significant wave height reported by any vessel on February 24 within a radius of 200 miles of the TUXPAN's 1530 position was approximately forty feet, while the majority of the significant wave heights reported by these vessels reached only twenty feet.[60] Tr. 2349–51, 2354–61; Cl.Exhs. C8, C10.

126. Of approximately 200 ships within the area of the storm, only one—the BALSA 24—did not survive. *See* Tr. 584, 2357–58; J.Exhs. 97, 652, 653, 654, 655, 690; Cl.Exhs. C7, C8, C10, C11.

127. Subsequent to the TUXPAN's 1530 report, Tecomar sent seven telexes to the ship.[61] J.Exhs. 178–85, 219–21; Tr. 1267.

---

**59.** Although the Captain of the EXPORT PATRIOT testified that he experienced 60 to 80 foot waves, he conceded that this estimation was made while in the trough of the wave, that "it's all guesswork," since "[t]here is no way to measure [the waves] accurately." Tr. 79, 85. Furthermore, the court finds it improbable that 60–80 foot waves existed, given the fact that the Captain reported 40 to 50 foot waves to the Coast Guard at 1220 and yet neglected to report the 60–80 foot waves that he allegedly saw two hours later. Tr. 113–14.

**60.** Tecomar relies heavily on one GSOWM hindcast from midnight of February 24 which reported significant wave heights of 51 feet in the area of the TUXPAN's 1530 position. Pet. Proposed Post-trial Findings of Fact ¶ 64, Pet. Post-trial Brief at 15–16, 20–21, 34, 47. At trial, however, the accuracy of the GSOWM was severely undermined. The GSOWM hindcasts tended to give higher significant wave heights than were recorded by GEOSAT or were reported by the vessels in the storm. *See* Tr. 346–70. For example, GSOWM indicated significant wave heights of 49, 47, and 51 feet for for a specific area at midnight on February 24, whereas the M/V VOLGA—which was located in the same area at the same time—reported wave heights of only 18 feet. Tr. 1417–21; 351–54; J.Exhs. 535, 629–31, 636, 652–54, 689; Cl. Exhs. C3, N; *see also* Tr. 1395–1404.

**61.** At first, Tecomar did not disclose the fact that any telexes had been sent to the TUXPAN after February 24. Tr. 1311. Rather, references to these telexes were accidentally discovered in the subpoenaed files of Tecomar's hull insurer, the Fred S. James Co. *See* J.Exh. 747, 1335 at 121–23, 204–10; Tr. 1256–58, 1311. Thereafter, copies were forwarded by Tecomar on demand by Claimants.

128. The first telex was sent by Lopez at 1304 (local Mexico City time) on February 24. J.Exh. 178; Tr. 1280, 1284. In this telex, Lopez stated that he was aware of the fact that the fuel acquired by the TUXPAN in Antwerp, Belgium on February 14 was having "negative effects" on its main engine. Tr. 1280, 1284; J. Exh. 178.

129. Lopez sent three more telexes on February 26. J. Exhs. 180, 181, 182. In the first of these, Lopez requested the vessel to advise Tecomar of the best possible ETA for the ports of Veracruz and Tuxpan, Mexico. J.Exh. 180. Lopez also authorized the chief engineer to operate the ship at the highest speed in order to make up for the time lost during the storm, "and this way, satisfy the cargo shippers who are pressing us more each day." [62] *Id.* In the second telex—sent approximately one hour after the first—Lopez requested the captain to confirm the workshifts of the helmsmen and to send him a list of the specific days on which the helmsmen earned overtime wages. J. Exhs. 181; Tr. 1318–21. Approximately one-half hour later, Lopez sent a third telex requesting an estimation of the draft which the TUXPAN would have after unloading cargo in Veracruz and whether it would be necessary to rearrange the cargo in order to reduce the ship's draft.[63] J.Exh. 182.

130. On February 27, three more telexes were sent by Tecomar to the ship. J.Exhs. 183, 184, 185. The first advised the Captain of current exchange rates between the United States dollars and Mexican pesos. J.Exh. 183. The second requested the Captain to "get in touch with these offices by telephone," or to call Lopez or Hernandez at home. J.Exh. 184. In the third telex, Lopez set forth a detailed accounting of the expenses and net pay for every crew member during the month of February. J.Exh. 185; Tr. 1049, 1346, 1325–26. These computations as to net pay, however, were based on information which Lopez had requested in a telex sent to the ship the previous day, i.e., on the Captain's confirmation of the crew's workshifts and overtime. *See* J.Exh. 181. Given this fact, it is clear that Lopez was communicating with the TUXPAN as late as February 27.

131. When a shipowner has not heard from its vessel for more than twenty-four hours, the customary practice in the shipping industry is to immediately contact the local maritime authorities. *See* PTO ¶¶ 58–59, 70–71.

132. Tecomar maintains that the TUXPAN's 1530 report on February 24 was the last time it had heard from the ship. Tr. 1270–96. For the following reasons, however, the court finds this to be highly unlikely. None of the telexes sent by Lopez after February 24 contains an inquiry as to the ship's location or condition, even though he knew that Tecomar vessels must report their positions every twenty-four hours, and that the TUXPAN had recently experienced heavy weather. J. Exhs. 178, 180–85; Tr. 1270–96, 1304–06, 1318, 1314–15, 1323–25. Furthermore, within the three-day period from February 24–27, Lopez did not attempt to contact the Coast Guard or any other maritime authorities, even though he knew that that this was the customary practice of a prudent shipowner,

---

**62.** There is some confusion in the record as to which city was the TUXPAN's first port of call. Prior to February 24, the ship's first port of call was Vera Cruz. On two occasions after February 27, however, Tecomar indicated to the Coast Guard and to its insurance broker that the first port of call was Tuxpan. *See* J. Exhs. 90, 180, 186, 527. Thus, the information that Tecomar supplied to the Coast Guard and its insurance broker was different from the information contained in its communications with the vessel prior to February 24. This discrepancy, coupled with the unexplained reference to Tuxpan in the February 26 telex, further evidences the fact that Tecomar was in communication with the vessel after February 24.

**63.** Apparently, Tecomar requested information about the TUXPAN's draft because the ship was scheduled to go to Tuxpan, Mexico, which is a draft-restricted port, i.e., vessels whose drafts exceed a certain amount cannot enter that port. Tr. 1314, J. Exhs. 69, 182. Although Tecomar refers to Tuxpan as an additional port of call, it is not entirely clear whether this reference was a change of the ship's first port of call (from Vera Cruz to Tuxpan), or whether it was merely an addition to the ship's itinerary. Regardless, however, these somewhat oblique and unexplained references further support the court's conclusion that Tecomar was in communication with the TUXPAN after February 24.

and that through Tecomar's participation in the AMVER program, these authorities could have helped obtain information regarding the TUXPAN.[64] Tr. 1297–98.

133. The mundane content and tone of the telexes sent between February 24 and 27 coupled with Tecomar's failure to notify the maritime authorities during this period, indicate that Tecomar was communicating with the TUXPAN after February 24.[65] Moreover, according to an official report issued by the Mexican government, discussed *infra*, Tecomar received two telexes from the TUXPAN on February 26 and 27.[66] J.Exhs. 92, 97 at 2.

134. In light of all of these circumstances, the court concludes that Tecomar was communicating with the TUXPAN as late as February 27.[67] Based on the evidence before the court, however, it is impossible to ascertain when, where, and under what conditions the TUXPAN sank.

D. *Post-voyage Investigation*

135. On the morning of February 28, Lopez informed the President of Tecomar, Peter Harmsen, that he had been unable to communicate with the vessel for four days. PTO ¶ 24; Tr. 1053, 1328–29.

136. That same day, Tecomar contacted the Coast Guard and the Mexican Maritime Authorities to report the TUXPAN as missing. PTO ¶ 98; J.Exhs. 90 at 3, 1336 at 82, 101.

137. On March 4, Tecomar's Marine Manager, Captain Perez, and Port Engineer Luis Castro met with the Coast Guard in New York to provide assistance in the search for the TUXPAN. PTO at ¶ 87; Tr. 1057; J.Exhs. 1335 at 317, 1336 at 121–33, 119, 727, 90 at 103–05. To establish the geographical scope of the search, the Coast Guard used the information it received from Tecomar, e.g., that the 1530 telex on February 24 was the TUXPAN's last report. *See* J.Exh. 1336 at 160–61; Tr. 447–48. The exact area of the search was determined by a computer model based on calculations of weather, drift, and currents. Tr. 447–48.

138. On March 4, the Coast Guard dispatched airplanes to search for the TUXPAN. *See* J.Exh. 90. During the five-day period from March 3–8, the Coast Guard and the United States Navy searched 19,-000 square miles of the North Atlantic, but found no trace of the ship. *See* J.Exh. 90.

139. Subsequently, Tecomar chartered the M/V HEICON to conduct its own search for the TUXPAN. *See* Tr. 1341; J.Exh. 1336 at 57. On March 8, Tecomar directed the HEICON to look for the TUXPAN in an area which was over 100 miles

64. Lopez asserted at trial that he was not concerned with the alleged inability to communicate with the ship because it had experienced prior breakdowns in communication. Tr. 1763; J.Exh. 1335 at 195. While this may be true, it does not explain why—after the TUXPAN had just encountered an extra-tropical cyclone—Lopez would not at least contact the Coast Guard in order to ascertain the location and condition of the vessel. In fact, Tecomar showed no concern for the welfare of its ship until February 27, when Lopez remained in his office the entire night awaiting any communication from the vessel. Tr. 1051, 1326.

65. In arguing against this conclusion, Tecomar asserts that none of the telexes to the TUXPAN between February 24–27 were invoiced by Radio Mexico. Pet. Proposed Post-trial Findings of Fact ¶¶ 73–74. However, since Radio Mexico was not the only station through which communications between Tecomar and the TUXPAN were transmitted, Tecomar could have easily communicated with its ship through another radio station or by telephone. *See* Findings of Fact ¶ 37.

66. Although Tecomar contends that these references were merely typographical errors, the court finds this highly unlikely given the fact that four members of the Mexican Maritime Authorities and the Vice President of Tecomar initialed every page of the report. J.Exh. 1335 at 337–39; J.Exh. 97 at 2, 4.

67. What happened to the TUXPAN after February 27 remains a mystery. The most likely explanation is that the ship suffered yet another problem with its engine and was forced to remain adrift. As had happened on three previous occasions, the TUXPAN would temporarily lose the ability to communicate while running adrift. Thus, if the seas had been at all rough—which was quite possible given the storm that had just passed—the ship could have easily foundered without being able to send a distress signal.

south of the TUXPAN's customary route.[68] Tr. 1341; J.Exhs. 1336 at 157; *see also* J.Exhs. 92, 729.

140. On March 10, the HEICON discovered a container, numbered ICSU 358412-3, at a location approximately 170 miles southeast of the TUXPAN's 1530 position. J.Exh. 93; Pet. Exh. 16. The container was positively identified as having been leased to Tecomar and loaded on the TUXPAN at Antwerp before its last voyage.[69] J.Exhs. 92, 93, 94.

141. Other than this container, no flotsam was discovered in the vicinity of the TUXPAN's last reported position. Tr. 488-89. Furthermore, none of the ship's lifesaving equipment was ever sighted, and no bodies were ever found. Tr. 488-96.

142. On March 10, the Director of the Mexican Merchant Marine commenced an investigation to determine the facts and circumstances relating to the disappearance of the TUXPAN. PTO ¶ 99. On the same day, the Mexican Maritime Authorities subpoenaed Tecomar to appear before their representatives on March 16 and present any evidence surrounding the ship's disappearance. *Id.* ¶ 100.

143. In compliance with the subpoena, Viveros appeared on March 16 before a panel of Mexican Maritime Authorities in Mexico City and presented certain records regarding the disappearance of the TUXPAN. *Id.* at ¶¶ 102, 105; J.Exh. 1335 at 336-37. Viveros, however, did not inform authorities of the TUXPAN's crack history or engine problems. *See* J.Exhs. 92, 222.

144. The official minutes that were taken at this meeting formed the basis of the official investigative report—the "ACTA" —issued by the Mexican Maritime authorities on April 6. J.Exh. 1335 at 337-38, 348-49. Viveros and the others present at the meeting not only signed the ACTA, but also reviewed and initialed each individual page.[70] J.Exh. 1335 at 337-39; J.Exh. 97 at 2, 4.

145. Based on the files that Viveros turned over to the Mexican Maritime Authorities, the ACTA contains a list of all the telexes sent from the TUXPAN to Tecomar during the vessel's last voyage. J.Exh. 97 at 2; J.Exh. 1335 at 340-44, 372. Interestingly, this list includes telexes sent from the TUXPAN on February 26 and 27, even though no such telexes were ever produced by Tecomar.[71] J.Exh. 97 at 2; J.Exh. 1335 at 340-44, 372.

146. The ACTA concludes that the sinking of the TUXPAN was caused by the storm of February 24. PTO at ¶ 106; J.Exhs. 92, 222. This conclusion, however, was based on the data supplied by Tecomar, which did not include the TUXPAN's crack history, its engine breakdowns, and the problems with its seawater cooling system.[72] *See* J.Exh. 2, 92, 222; *see also* J.Exh. 1335 at 376-77.

---

**68.** This fact is a further indication that Tecomar was in communication with the TUXPAN after February 24, and that as a result, Tecomar had a more accurate idea than the Coast Guard as to where the vessel sank.

**69.** The container had been stowed below deck in hatch # 2, Bay # 11. J.Exhs. 92, 95, 194, 1319; Cl.Exhs. A1, A2; *see also* J.Exhs. 1336 at 156, 1335 at 367-68.

**70.** By signing and initialing the ACTA, the participants at the meeting represented that they agreed with the document's contents. In fact, several corrections were made to the ACTA's text, indicating that it had been reviewed for accuracy before being ratified. J.Exh. 1335 at 338-40.

**71.** Tecomar claims that the references to telexes from the ship after February 24 were typographical errors. *See* J.Exh. 1335 at 341-44. Apparently, these alleged errors went unnoticed until several days after the March 16 meeting, at which time Lopez brought them to Viveros' attention. J.Exh. 1335 at 342-43. In light of the fact that four different persons from Tecomar reviewed, initialed, and signed the ACTA, the court finds that the references to these telexes were not merely typographical errors.

**72.** Specifically, Tecomar failed to provide the TUXPAN's deck logs, the telex file from the previous year, the monthly tank and bilge reports, the technical files, the monthly fuel and lube oil consumption reports, the inspection reports, the engine log books, the fuel analysis reports, and the repair files from MacGregor, MAK, and Donjak. *See* J.Exhs. 2, 92, 222; *see also* J.Exh. 1335 at 376-77. Furthermore, the telex file from the last voyage did not include the seven telexes sent by Tecomar to the vessel after February 24. *See* J. Exh. 92, 222.

## DISCUSSION

### A. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1333.

### B. Applicable Law

 Tecomar's liability for the TUXPAN's lost cargo is governed by COGSA, 46 U.S.C.App. §§ 1300 *et seq.*, and the Hague–Visby Rules.[73] The cargo that was bound for the United States is governed by COGSA, while the cargo that was bound for Mexico is governed by the Hague–Visby Rules as adopted and interpreted by the country in which the cargo was loaded. PTO at 100 ("Agreed upon Issues of Law"). Thus, the cargo that was loaded in Germany is governed by the Hague–Visby Rules as adopted and interpreted by the Federal Republic of Germany, and the cargo that was loaded in Belgium is governed by the Hague–Visby Rules as adopted and interpreted by Belgium.[74] *Id.;* Tr. 2798–99. Any overall limitation of Tecomar's liability is governed by the Limitation Act, 46 U.S.C.App. §§ 181–89.

### C. Burdens of Proof

 Under COGSA, the burden is on the cargo claimants to establish a prima facie case by showing that the cargo was lost or damaged while in the custody of the carrier. 46 U.S.C.App. § 1303; *Caemint Food, Inc. v. Lloyd Brasileiro Companhia de Navegacao,* 647 F.2d 347, 351–52 (2d Cir. 1981). Since Tecomar has conceded that it received the cargo in good order and condition, and that it failed to deliver the cargo to the owners and consignees, Claimants have met this burden. Pet. Post-trial Brief at 107.

 Since Claimants' have established their prima facie case, the burden shifts to Tecomar to establish its defenses by showing that the cause of damage falls within one of COGSA's exceptions set forth in 46 U.S.C.App. § 1304(2). *See M. Golodetz Export Corp. v. The S/S Lake Anja,* 751 F.2d 1103, 1110 (2d Cir.1985), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985). Tecomar asserts two related, but independent, defenses: (1) that the loss was caused by a "peril of the sea," and (2) if not caused by a peril of the sea, that Tecomar exercised "due diligence" in making the ship seaworthy. 46 U.S.C.App. § 1304(1), (2). The parties do not dispute that the burden is on the carrier to prove that the weather encountered by the ship constituted a peril of the sea. *See Freedman & Slater, Inc. v. The M.V. Tofevo,* 222 F.Supp. 964, 969 (S.D.N.Y.1963). The parties disagree, however, as to who must bear the burden of proving whether the ship was seaworthy at the commencement of her voyage.

Claimants argue that because the definition of a peril of the sea entails the existence of a seaworthy ship, the carrier has the burden of proving both the peril and the ship's seaworthiness. Claimants rely primarily on *J. Gerber & Co. v. The S.S. Sabine Howaldt,* 437 F.2d 580 (2d Cir. 1971), wherein the Second Circuit asserted that COGSA's usual allocation of burdens is "altered in cases in which the carrier seeks exoneration under ... 'the perils of the sea' exception, because of the definition of that exception." *Id.* at 589. According to the *The Sabine Howaldt,* in order to establish a peril of the sea defense, "the [carrier] [has] to establish freedom from negligence." *Id.* (quoting G. Gilmore & C. Black, The Law of Admiralty, § 3–32 at 140 (1957)).

Tecomar, however, argues that although *The Sabine Howaldt* is the most recent Second Circuit case to address this issue, the particular passage relied on by Claimants is dictum, and as such, is not binding on this court. Moreover, Tecomar asserts that the court should not follow the reason-

---

**73.** The Hague Rules were enacted on August 24, 1924, but were later amended on February 23, 1968. The Rules and their amendments will hereinafter be referred to as "the Hague–Visby Rules."

**74.** Since the interpretation of COGSA and the Hague–Visby Rules are almost identical, the court will limit its discussion to COGSA unless otherwise required.

ing of this passage because such a change in COGSA's burden-shifting scheme would be contrary to the well-established law in this circuit prior to *The Sabine Howaldt.* In support of its argument, Tecomar cites several pre-*Sabine Howaldt* cases, all of which maintain that the burden of proving unseaworthiness rests on the cargo claimants. *See e.g., Lekas & Drivas, Inc. v. Goulandris,* 306 F.2d 426, 432 (2d Cir.1962) (merely raising issue of carrier's negligence does not put burden of persuasion back on carrier, since to do so would give "inadequate weight to the division, made in § 4(2) of COGSA, between the specifically excepted causes (a)-(p) and the 'Catch-all' (q) ..."); *Isbrandtsen Co. v. Federal Ins. Co.,* 113 F.Supp. 357, 359 (S.D.N.Y.1952) ("nothing in the language of [COGSA] requires proof of seaworthiness to make available the exceptions listed in § 4(2)"), *aff'd,* 205 F.2d 679 (2d Cir.) (per curiam), *cert. denied,* 346 U.S. 866, 74 S.Ct. 106, 98 L.Ed. 377 (1953); *The Naples Maru,* 20 F.Supp. 258 (S.D.N.Y.1937) (burden on cargo interests to prove negligence), *modified,* 106 F.2d 32, 35 (2d Cir.1939). Tecomar also analogizes to the shifting burdens of proof found in COGSA's fire exception. *See* 46 U.S.C.App. 1304(2)(b) (carrier not responsible for loss or damage arising from fire unless caused by actual fault or privity of carrier). The Second Circuit has emphatically held that when the carrier has invoked COGSA's fire exception, the burden is on the cargo claimants to prove the carrier's negligence. *See Asbestos Corp. Ltd. v. Compangnie de Navigation,* 480 F.2d

669, 673 (2d Cir.1973); *In re Ta Chi Navigation (Panama) Corp., S.A. as Owner of the S.S. Eurypylus,* 677 F.2d 225, 229 (2d Cir.1982) ("[w]hen Congress wanted to put the burden of proving freedom from fault on a shipowner claiming the benefit of an exemption, it specifically said so. *See* 46 U.S.C. § 1304(2)(q)").[75]

The law of this circuit prior to *The Sabine Howaldt* put the burden on the cargo claimants to prove that the ship was unseaworthy and that the unseaworthiness was a concurrent cause of the loss. Oddly, however, although the dicta in *The Sabine Howaldt* essentially changed this rule, that court never mentioned the caselaw that it declined to follow. In addition, the only court in this circuit which has addressed the issue after *The Sabine Howaldt*[76] explicitly placed the burden of proving unseaworthiness on the cargo claimants:

> [i]f the carrier establishes that it falls within such an exception under [COGSA], the cargo owner must then establish that the vessel was unseaworthy and that the unseaworthiness was at least a concurrent cause of the loss.

*Yawata Iron & Shipping Co., Ltd. v. Anthony Shipping Co., Ltd.,* 396 F.Supp. 619, 621 (S.D.N.Y.1975), *aff'd,* 538 F.2d 317 (2d Cir.1976). Furthermore, in the context of COGSA's fire exception, the Second Circuit has explicitly noted—also subsequent to *The Sabine Howaldt*—that none of the § 1304(2)(a)-(p) exceptions places the burden of proving freedom from fault on the carrier. *Ta Chi Navigation,* 677 F.2d at 229. Thus, while it is true that conceptual-

**75.** The issue of the burden of proving seaworthiness in relation COGSA's fire exception has created a heated controversy between the Second and Ninth Circuits. The Second Circuit has held that "[i]f the carrier shows that the damage was caused by fire, the shipper must prove that the carrier's negligence caused the damage." *Asbestos Corp. Ltd. v. Compagnie de Navigation,* 480 F.2d 669, 673 (2d Cir.1973). Criticizing this approach, the Ninth Circuit maintained that in order to invoke any of COGSA's exceptions, the carrier must prove seaworthiness. *Sunkist Growers Inc. v. Adelaide Shipping Lines,* 603 F.2d 1327, 1335–36 (9th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980). In responding to *Sunkist,* the Second Circuit has reaffirmed its analysis in *Asbestos. Ta Chi Navigation,* 677 F.2d at 229 (strongly

disagreeing with *Sunkist's* interpretation of the interrelation between the Fire Statute and COGSA). Recently, however, the Ninth Circuit has adopted the Second Circuit's position. *People's Insur. Co. of China v. M/V Damodar Tanabe,* 903 F.2d 675, 683 (9th Cir.1990).

**76.** In *Nichimen Co. v. The M/V Farland,* 333 F.Supp. 691 (S.D.N.Y.1971), *modified,* 462 F.2d 319 (2d Cir.1972), the court stated that a carrier may not come within the peril of the sea exception due to its own negligence. *Id.* at 698. However, because the court decided that the weather in question did not constitute a peril of the sea, it never squarely addressed the issue of whether the carrier had to prove seaworthiness in order to invoke that exception. *Id.*

ly, the notion of seaworthiness enters into the definition of "peril of the sea," it does not follow that this interrelation alters the burden-shifting scheme of COGSA. Even though a carrier has the obligation to provide a seaworthy ship, it is incumbent upon the cargo claimants to prove that the carrier breached that obligation.

■ Accordingly, the burdens of proof in this case are allocated as follows: Tecomar must establish that the weather encountered by the ship constituted a peril of the sea and that the peril caused the loss.[77] If Tecomar succeeds, the burden shifts to Claimants to establish that the vessel was unseaworthy and that the unseaworthiness was at least a concurrent cause of the loss. Even if this is proven, however, Tecomar can still avoid liability under COGSA if it shows that it exercised due diligence in attempting to make the TUXPAN seaworthy. *Id.* Moreover, if Tecomar proves that it had no privity or knowledge of whatever caused the loss, Tecomar can limit its liability pursuant to the Limitation Act.

### D. *Peril of the Sea*

Section 4(2)(c) of COGSA exempts a carrier from liability for lost cargo if the loss resulted from "[p]erils, dangers, and accidents of the sea...." 46 U.S.C.App. § 1304(2)(c). Thus, a carrier must prove not only the existence of a peril of the sea, but also that the peril caused the loss. *The Lassell,* 53 F.2d 687 (E.D.N.Y.1925).

■ The test for determining whether a storm constitutes a peril of the sea is whether—in light of all the circumstances—the storm was expectable. *The Sabine Howaldt,* 437 F.2d at 596; *see also New Rotterdam Ins. Co. v. The S.S. Loppersum,* 215 F.Supp. 563, 567 (S.D.N.Y. 1963) (test is one of foreseebility, i.e., whether the conditions encountered were unusual and beyond reasonable expectation). However, the *Sabine Howaldt* court

made it clear that "[n]o exact Beaufort Scale wind force can be referred to as the dividing line which will determine those cases in which a peril of the sea is present and those, below that mark, in which it is not." 437 F.2d at 596. Every peril of the sea case, therefore, must turn on its own particular facts. *See Taisho Marine & Fire Ins. v. The M/V Sea–Land Endurance,* 815 F.2d 1270, 1272 (9th Cir.1987); *Diethelm & Co., Ltd. v. The S.S. Flying Trader,* 141 F.Supp. 271, 272 (S.D.N.Y. 1956), *aff'd,* 244 F.2d 542 (2d Cir.1957).

■ One consideration in determining whether a particular storm constitutes a peril of the sea is the strength and nature of the wind, i.e., "whether the winds are steady for a number of hours from one direction or are in frequent gusts lasting less than a minute on each occasion or are cyclonic and shifting." *The Sabine Howaldt,* 437 F.2d at 596. Another factor is the state of the seas, i.e., whether "[t]he seas ... proceed in a fairly regular procession of coamers or consist of turbulent cross seas which can be very destructive." *Id.* Other circumstances such as "duration of the weather, size of the vessel, wave intervals, crossing seas, [and] structural damage" should also be considered. *American Int'l Ins. Co. v. The S.S. Fortaleza,* 446 F.Supp. 221, 226 (D.P.R.), *aff'd,* 585 F.2d 22 (1st Cir.1978).

The court begins by noting that "the North Atlantic in the winter is a most inhospitable place." *Kane Int'l Corp. v. The M.V. Hellenic Wave,* 468 F.Supp. 1282, 1285 (S.D.N.Y.), *aff'd mem.,* 614 F.2d 1287 (2d Cir.1979). It is more expectable, therefore, to encounter severe weather conditions in the North Atlantic during the winter months than on other navigational routes. *See id.* Accordingly, most storms occurring in the winter North Atlantic have been held not to constitute perils of the

---

77. Tecomar argues that under German law, if the shipowner proves the existence of a peril of the sea, the peril is presumed to have caused the loss. Pet. Post-trial Brief at 144–47. Cargo's expert on German law, however, explained that this presumption applies only when there is no question raised as to seaworthiness. *See* Tr.

2831–32. The expert further testified that if seaworthiness is an issue, the shipowner must ultimately prove seaworthiness or due diligence in order to prevail on a peril of the sea defense. *See* Tr. 2831–32. Thus, German law on this point *does not differ from* COGSA.

sea. *See, e.g., id.* (Beaufort Force 11 winds "to be expected on a voyage in the North Atlantic in mid-winter"); *Palmer Distrib. Corp. v. The S.S. Am. Counselor,* 158 F.Supp. 264 (S.D.N.Y.1957) (Beaufort Force 11); *The City of Khios,* 16 F.Supp. 923, 924 (S.D.N.Y.1936) (Beaufort Force 11 with squalls of hurricane force).

In addition, many storms in the winter North Pacific—another area where meteorological bombs often occur—have been held not to constitute perils of the sea. For example, a ship that encountered winds of Beaufort Force 10 and was rolling[78] between thirty-five and forty degrees during most of the voyage was not exonerated from liability, since the carrier conceded that this was expectable weather in the winter North Pacific. *See Houlden & Co., Ltd. v. S.S. Red Jacket,* 1977 A.M.C. 1382, 1391 (S.D.N.Y.1977). In another case, the court denied exoneration to a ship that experienced violent rolling and pitching[79] and winds of Beaufort Force 11, reasoning that although the storm was intense, it was a common occurrence in the winter North Pacific. *See Nichimen Co. v. The M.V. Farland,* 333 F.Supp. 691, 694, 698 (S.D.N.Y.1971), *modified,* 462 F.2d 319 (2d Cir. 1972); *see also States Steamship Co. v. United States,* 259 F.2d 458 (9th Cir.1957) (sinking with all hands in mountainous and confused seas accompanied by winds of Beaufort Force 9), *cert. denied,* 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305, *reh'g denied,* 359 U.S. 921, 79 S.Ct. 579, 3 L.Ed.2d 583 (1959).

In the few cases where winter storms in the North Pacific or the North Atlantic have been held to constitute perils of the sea, the ship in question had been subjected to severe weather conditions for a substantial period of time. *See, e.g., Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha (The Naples Maru),* 106 F.2d 32 (2d Cir.1939) (ship in Pacific during winter encountered winds of Beaufort Force 9–10 for three to four days); *The*

*Sea–Land Endurance,* 815 F.2d at 1273 (ship sailing from Japan to California encountered at least four waves in excess of sixty feet which rolled vessel more than forty degrees, substantial number of waves between forty and sixty feet, and winds Beaufort Force 10–12 over period of seven hours including gusts in excess of ninety-five knots); *The Sabine Howaldt,* 437 F.2d at 584–88 (ship sailing in winter North Atlantic experienced winds of Beaufort Force 11 for thirteen hours and Force 11–12 for five hours, including wind speeds of up to eighty knots).

■ Here, the TUXPAN's 1530 report of February 24 establishes that the ship was experiencing Beaufort Force 11 winds and Douglas Force 8 significant wave heights. Findings of Fact ¶ 117. However, although such conditions are severe, they are nevertheless "expectable" in the North Atlantic during the middle of February. Tr. 1367–72, 1375–76; *see also* Tr. 1437, 1479–80, 371–72, 395; Cl.Exhs. E, F. Moreover, the TUXPAN was not only built to withstand such weather, but had actually sailed through many similar conditions. Findings of Fact ¶¶ 41–43. It is quite understandable, therefore, that the TUXPAN's 1530 report—noting winds of Beaufort Force 11 and seas of Douglas Force 8—did not include a distress signal or request for assistance, and did not cause Tecomar great concern for the safety of the ship. Findings of Fact ¶¶ 117–118, 127–132.

Tecomar contends that the TUXPAN later encountered more severe weather than was reported at 1530, and that these more severe conditions caused the ship to sink on the evening of February 24. Such a theory, however, is based on sheer conjecture. First, none of the evidence presented establishes when or where the TUXPAN sank in relation to the storm. Furthermore, since the ship was never found, there is no evidence of any damage she sustained as a result of the storm. Without this basic

---

**78.** "Rolling" is "the transverse oscillating rotation of a vessel about a longitudinal axis...." R. de Kerchove, *supra,* at 657.

**79.** "Pitching" is "the angular motion which a ship makes about a transverse axis through her center of gravity in a seaway." R. de Kerchove, *supra,* at 587.

information, the court cannot fairly conclude that the TUXPAN experienced weather more severe than was described in her 1530 report on February 24. Furthermore, the telexes from Tecomar to the TUXPAN indicate that the vessel was safely afloat as late as February 27—three days after the storm has passed to the northeast. Findings of Fact ¶¶ 127–34.

In attempting to establish its peril of the sea defense, Tecomar relies heavily on the evidence from other ships in the general area of the TUXPAN during the February 24 storm. Three captains from two different ships testified that this was the worst storm they had seen in their maritime careers. Although the testimony of these Captains is certainly compelling, it is of limited probative value since each of the ships (and the others cited by Tecomar) was located over 200 miles away from the TUXPAN's 1530 position.[80] J.Exhs. 589, 590; Pet.Exh. 652; Cl.Exhs. C10, C11.

The Captain of the SELKIRK SETTLER testified that his ship was continually pooped by the sea and was experiencing seventy to eighty foot waves.[81] Tr. 138, 147–48; 137–38, 163. However, neither the ship's deck log abstract nor the ship's weather logs reflected waves of such magnitude. Tr. 158–169; J.Exh. 548. Furthermore, some photographs which were taken during the storm show waves of approximately thirty feet. J. Exhs. 549, 552, 553, 559–85; Pet.Exhs. 10–10D; Tr. 179–80. Thus, since the captain's recollection of seventy to eighty foot waves was contradicted by more reliable sources of information, the wave heights encountered by the SELKIRK SETTLER were probably closer

to those which usually accompany 50 knot winds, i.e., 20 to 30 feet. *See* J.Exh. 545.

The Captain of the EXPORT PATRIOT—a ship closer to the center of the storm than was the SELKIRK SETTLER—testified that the plate glass windows on the ship's wheelhouse were broken by a direct hit of green water.[82] Tr. 60–61, 109, 111; J.Exhs. 1289, 1290. However, because the wheelhouse is only eighty-three feet back from the bow, it is subject to more severe buffeting by the waves as they come over the front of the ship.[83] *See* Tr. 89–90. Furthermore, even though the wheelhouse windows were shattered, the ship did not lose any containers and suffered very little damage to her stern. Tr. 109, 75. The damage to the EXPORT PATRIOT's wheelhouse, therefore, was most probably caused by the unusual structure of the ship.

The Captain of the WESTERHAMM characterized the storm as the worst he had ever seen and stated that the weather conditions had forced his ship to travel for two days in the wrong direction. J.Exh. 1332, at 27–28. The Captain also testified, however, that at no time during the storm did he ever perceive any danger of capsizing. J.Exh. 1332, at 30.

Tecomar also relies heavily on the testimony of Robert I. Price (Vice Adm., U.S. Coast Guard, Ret.) who concluded—after a comprehensive analysis—that the TUXPAN probably capsized. Pet. Post-trial Brief at 8. Vice Admiral Price's conclusion, however, was based on the following unproved assumptions: (1) that the TUXPAN experienced the worst of the storm at

---

80. In attempting to establish the relevance of the evidence from these ships, Tecomar emphasizes that the size of the storm was unusually large. Pet. Proposed Post-trial Findings of Fact ¶¶ 1–2, 9. Even if true, however, the size of the storm has little, if any, relevance to its intensity.

81. Pooping occurs when the sea breaks on the stern of a ship as a result of a following sea overtaking the vessel, thereby preventing its stern from lifting above the crest of the waves. *See* De Kerchove, *supra,* at 598.

82. Green water is "a mass of water shipped on a vessel's deck, so considerable as to present a

greenish appearance ... [a]n unbroken wave." R. de Kerchove, *supra,* at 337. Green water is more substantial than "spray," which is merely water dispersed on the vessel "either by the wind or by the impact of waves against the ship's sides." *Id.* at 767.

83. This situation was exacerbated by the fact that the Captain headed the ship directly into the wind and the seas in order to prevent excessive rolling. Tr. 110. Unlike the EXPORT PATRIOT, the bridge on the SELKIRK SETTLER is located toward the stern of the ship, and thus, the SELKIRK's bridge suffered no damage. Tr. 128, 133.

approximately 2300 on the evening of February 24; (2) that the TUXPAN encountered waves of sixty to seventy feet, (3) that the TUXPAN began to severely slam against the waves; and (4) that the Master of the TUXPAN decided to turn the ship around when the slamming became too intense.[84] Tr. 524–27, 597, 936–37. With all due respect to the Vice Admiral's expertise, the court must reject his conclusion since it was based on the premises mentioned above, none of which were proved at trial.

Based on the limited evidence as to the TUXPAN's location in the storm of February 24–25, the court concludes that the weather which the ship encountered was expectable, and as such, did not constitute a peril of the sea.

### E. *Seaworthiness*

▇▇▇▇ Even if the TUXPAN did experience conditions severe enough to constitute a peril of the sea, Claimants have proven, as discussed *infra*, that the ship was unseaworthy at the commencement of its voyage, and that this condition caused her loss. Under COGSA, a carrier has the duty to exercise due diligence in providing a seaworthy vessel at the commencement of the voyage. 46 U.S.C.App. § 1303(1)(a); *In re Grace Line, Inc.*, 517 F.2d 404 (2d Cir.1975). Whether a vessel is seaworthy depends upon the type of vessel and the nature of the voyage. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). The general rule is that "the vessel must be staunch, strong, [and] well equipped for the intended voyage...." *Id.* at 1155.

One symptom of a ship's unseaworthiness is the presence of cracks. In *States Steamship Co. v. United States*, the M/V PENNSYLVANIA sank with all hands during a winter storm in the North Pacific. 259 F.2d 458 (9th Cir.1957), *cert. denied*, 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305 *reh'g denied*, 359 U.S. 921, 79 S.Ct. 579, 3 L.Ed.2d 583 (1959). There, the court found

that a fourteen foot crack in the ship's hull and a defect in its steering gear constituted unseaworthiness, and that these conditions caused vessel to sink. *Id.* at 460–61. In *Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania De Vapores, S.A.*, the M/V PERAMA sank because of an unseaworthy condition which was manifested by cracks in the ship's hull, in its transverse bulkhead, and in the engine room. 388 F.2d 434, 437–38 (2d Cir.), *cert. denied*, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968). The *Federazione* court concluded that the extensive replacement and welding of plates in the hull "set up stresses within the hull ... which resulted in cracking in various parts of the hull and internal structures." *Id.* at 438. Furthermore, the court pointed out that the very existence of the cracks rendered the ship unseaworthy regardless of what particular type of cracks they were. *Id.* at 438. Defects in a ship's seawater cooling system have also been held to constitute unseaworthiness. In *Louis Dreyfus Corp. v. 27,946 Long Tons of Corn*, 830 F.2d 1321 (5th Cir.1987), the court found that faulty indicator lights on the control panel of the ship's seawater cooling system rendered the ship unseaworthy. *Id.* at 1324, 1326.

▇▇▇ As discussed *supra*, Claimants have the burden of proving that the TUXPAN was unseaworthy and that this condition caused the loss. Here, the evidence amply supports the court's finding that the TUXPAN was unseaworthy when it departed from Bremen on its last voyage. First, the cracks in the vessel's tanktops evidenced the ship's structural weakness as caused by the discontinuities in the TUXPAN's tanktop arrangement. Findings of Fact ¶¶ 33, 61, 71–72. Furthermore, these cracks increased the chance of water entering the holds of the ship. *See id.* ¶¶ 45, 55. The cracks in the hatch covers also evidenced structural weakness caused by the vessel's overflexibility. *Id.* ¶¶ 59, 72. Second, the main engine had a history of defects, many of which had not been remed-

---

**84.** Admiral Price based his opinion on other assumptions which the court need not address.

*See* Claimant's Post-trial Brief at 8.

ied before the TUXPAN's last voyage. Specifically, two of the cylinder liner seats and one cylinder head still needed repair; there were cracks in the engine foundation plate; the engine foundation bolts were loose; the proper tool to tighten the bolts was not onboard; and the pipes for the seawater cooling system still needed repair.[85] *Id.* ¶¶ 75–89, 90–106.

In the absence of eyewitness testimony, it is impossible to determine the causal chain which led to the sinking of the TUXPAN. Although the court cannot find with certainty which condition brought about the vessel's demise, the court concludes that the loss of the TUXPAN was caused by its unseaworthiness.[86]

### F. *Due Diligence*

■ A shipowner has the duty to exercise due diligence in providing a seaworthy ship. 46 U.S.C.App. § 1303(1)(a). Thus, even if unseaworthiness caused the loss, the shipowner can still be exonerated from liability under COGSA if it establishes that it exercised due diligence in attempting to make the ship seaworthy. *Id.; Yawata Iron & Steel Co., Ltd. v. Anthony Shipping Co., Ltd.,* 396 F.Supp. 619, 621 (S.D. N.Y.1975), *aff'd,* 538 F.2d 317 (2d Cir.1976). Due diligence consists of whatever a reasonably competent vessel owner would do under the circumstances. *General Foods Corp. v. The Troubador,* 98 F.Supp. 207 (S.D.N.Y.1951). For example, knowledge of abnormal conditions and failure to investigate their cause constitutes a lack of due diligence. *Hasbro Industries, Inc. v. M/S*

*St. Constantine,* 705 F.2d 339 (9th Cir. 1983) (shipowner, who knew that pipe support bracket should have been attached to lube oil pipe, failed to exercise due diligence when it neglected to investigate cause or effect of engine vibration that resulted in fire), *cert. denied,* 464 U.S. 1013, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983).

■ The duty to exercise due diligence in providing a seaworthy vessel is non-delegable. *In re Marine Sulphur Transport Corp.,* 312 F.Supp. 1081, 1105 (S.D.N.Y. 1970), *aff'd in part, rev'd in part,* 460 F.2d 89 (2d Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972). Thus, if a shipowner hires a third party to perform repair work, the failure of the third party to exercise due diligence is attributable to the shipowner. *Federazione Italiana Dei Consorzi agrari v. Mandask Compania De Vapores, S.A.,* 284 F.Supp. 356, *aff'd in part, rev'd in part,* 388 F.2d 434 (2d Cir.), *cert. denied,* 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968).

■ Tecomar argues that an "important exception" to the rule of non-delegability applies when the failure to exercise due diligence is on the part of the shipbuilder or the classification society. *See* Pet. Post-trial Brief at 133. Thus, Tecomar claims that a shipowner fulfills its duty to exercise due diligence by merely selecting a reputable designer, builder, and classification society. *Id.* Contrary to Tecomar's assertions, however, there is no such exception to the non-delagability rule of due diligence.[87] In *Navegacion Castro Riva, S.A.*

---

**85.** In arguing that the TUXPAN was seaworthy before its last voyage, Tecomar relies heavily on the fact that GL had issued the ship a certificate of seaworthiness. Although such a certificate is relevant for determining whether a ship was seaworthy, it is not determinative of the issue. *Navegacion Castro Riva, S.A. of Panama v. The Nordholm,* 178 F.Supp. 736, 741 (E.D.La.1959) ("classification societies often continue vessels in class long after their highest and best use would be as scrap"), *aff'd,* 287 F.2d 398 (5th Cir.1961); *see also Bank Line v. Porter,* 25 F.2d 843, 845 (4th Cir.), *cert. denied,* 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544 (1928) (certificate of surveyors disregarded where vessel found unseaworthy in fact).

**86.** Tecomar argues that Claimants have not proven either of the two proposed theories as to the TUXPAN's loss, i.e., that the ship capsized or that the ship broke apart. Pet. Post-trial Brief at 53–63. The court, however, is not persuaded by this argument. Regardless of how the TUXPAN sank—whether by breaking apart or by capsizing, the court is convinced that the ship's unseaworthiness caused the loss.

**87.** Tecomar argues that German and Belgian law provide for this same exception, i.e., that a shipowner is not responsible for lack of due diligence on the part of the shipbuilder or classification society. Pet. Post-trial Brief at 150–55. However, neither German nor Belgian law differ from COGSA on the issue of due diligence.

*of Panama v. The Nordholm,* the court concluded that a certificate of seaworthiness from a classification society does not conclusively establish a carrier's due diligence. 178 F.Supp. 736, 741 (E.D.La. 1959), *aff'd,* 287 F.2d 398 (5th Cir.1961). Similarly, the court in *Bank Line v. Porter* concluded that a certificate of seaworthiness did not establish the shipowner's due diligence because the shipowner had failed to disclose to the surveyor important information about the condition of its ship. 25 F.2d 843, 845 (4th Cir.), *cert. denied,* 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544 (1928). Moreover, the court in *Louis Dreyfus* noted that the approval of the vessel by two reputable classification societies—the American Bureau of Shipping and the Korean Register—"does not necessarily establish due diligence." 830 F.2d at 1327 (citations omitted). Furthermore, the fact that the vessel's unseaworthiness was the shipbuilder's fault did not prevent the *Louis Dreyfus* court from holding that the shipowner failed to exercise due diligence in detecting the problem. *Id.* at 1324, 1326.

■ All the cases which Tecomar relies on to support its argument are factually distinguishable in that they involve either undiscoverable defects, or shipowners who—after discovering a defect—subsequently disclose all the available information about the problem to a reputable third-party professional. *See, e.g., Peter, Paul, Inc. v. Rederi A/B Pulp (The Christopher Salen),* 258 F.2d 901, 905–06 (2d Cir.1958) (defect not discoverable because ship had not encountered any heavy weather and had not recorded any damage since its last inspection), *cert. denied,* 359 U.S. 910, 79 S.Ct. 586, 3 L.Ed.2d 574 (1959); *Balfour, Guthrie & Co. v. American–West African Line, Inc. (The Zarembo),* 136 F.2d 320, 321 (2d Cir.1943), (shipowner exercised due diligence because it had reported all the necessary information to its classification society), *cert. denied,* 320 U.S. 804, 64 S.Ct. 437, 88 L.Ed. 486 (1944); *The Floridian,* 83 F.2d 949 (2d Cir.1936) (shipowner exercised

due diligence because competent men considered the vessel seaworthy, after an inspection, with full knowledge of repairs made), *cert. denied,* 299 U.S. 577, 57 S.Ct. 41, 81 L.Ed. 425 (1936). The classification society in this case, however, did not possess the necessary information about the condition of the TUXPAN to conduct a thorough investigation of the ship's seaworthiness. Tecomar failed to inform GL that certain brackets specified in the ship's original construction drawings were not built into the ship and that the vessel had sustained structural damage as a result of heavy weather; it failed to report cracks in the double bottom area; it failed to report loose welds and the distorted shell plating under the foredeck; it failed to report cracks in the hatchcovers, hinges, stoppers, and swing seals, and it failed to report MacGregor's opinion that these cracks were caused by overflexibility of the ship. Findings of Fact ¶¶ 50–60, 73. Additionally, when Tecomar requested a one-year extension for the TUXPAN's class renewal, it failed to inform GL of the problems the ship had experienced with its stiffeners. *Id.* ¶¶ 64–73.

In an effort to maintain the ship's busy schedule, Tecomar repeatedly postponed repairs which were necessary to its seaworthiness. For example, Tecomar postponed repairs to the forecastle deck and shell plating, and to the cylinders of the main engine. *Id.* ¶¶ 67–68, 86–91. Tecomar also allowed the vessel to embark with weak pipes in its seawater cooling system and without the proper tool for tightening the loose bolts on the engine foundation. *Id.* ¶¶ 92–107.

In addition to this evidence of Tecomar's lack of due diligence, the court notes that Tecomar failed to produce any of the former masters or chief engineers of the TUXPAN. Although Tecomar did produce Technical Director Lopez and Vice President Viveros, neither of these witnesses had personal knowledge of the ship's daily maintenance. Tecomar's failure in this re-

---

*See* Tr. 2825–26, 2853–65. Indeed, Tecomar's own expert on German law explained that if a shipowner concealed material facts from its

classification society, the shipowner could not hide behind the society's certificate of seaworthiness. Tr. 2825–26.

gard creates an adverse inference against its defense of due diligence. 2 Wigmore on Evidence § 290(4); *J. Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580, 593 (2d Cir.1971).

The court finds, therefore, that Tecomar failed to exercise due diligence in attempting to make the TUXPAN seaworthy by the commencement of its last voyage. Accordingly, Tecomar is not exonerated from its liability for the lost cargo under COG-SA.

### G. *Limitation of Liability*

The final issue to be resolved is whether Tecomar's liability can be limited to (1) the overall value of the vessel and its pending freight pursuant to the Limitation Act, or (2) a per package amount pursuant to COG-SA or the Hague–Visby Rules.

#### (a) Overall Limitation

 Under the Limitation Act, a shipowner can limit its liability to the value of the ship and its pending freight if the shipowner can prove that the cause of the loss was not within its "privity or knowledge." 46 U.S.C.App. 183(a). The burden of proving lack of "knowledge or privity" under the Limitation Act is on the party who seeks the statute's benefit. *Marine Sulphur Transport*, 312 F.Supp. at 1092. The vessel owner must either show that it lacked privity or knowledge as to the cause of the loss, or if the owner cannot show precisely how loss occurred, it must show that it lacked privity or knowledge as to each possible cause. *Terracciano v. McAlinden Construction Co.*, 485 F.2d 304, 307–08 (2d Cir.1973).

 The "knowledge or privity" of a corporate shipowner includes the corporation's managing agents, officers, or supervising employees. *Waterman Steamship Corp. v. Gay Cottons*, 414 F.2d 724, 731 (9th Cir.1969); *Complaint of Seiriki Kisen Kaisha*, 629 F.Supp. 1374, 1387 (S.D.N.Y. 1986). A managing officer is anyone to whom the corporation has delegated "general management or general superintendence of the whole or a particular part of the business." *Waterman*, 414 F.2d at 731

(quoting *The Marguerite*, 140 F.2d 491, 494 (7th Cir.1944)).

 Here, the TUXPAN's unseaworthiness was clearly within the privity and knowledge of Tecomar's managing officers and supervising employees. Lopez, the Technical Director, was the head of the Technical Department and had plenary authority to make any repairs which he deemed necessary. Findings of Fact ¶¶ 5–13. Thus, any knowledge possessed by Lopez in his capacity as Technical Director was knowledge possessed by Tecomar. Accordingly, Tecomar knew about the problems with the ship's structural parts, such as the defective weldings, the missing brackets, the cracks in the wing tanks, tanktops, hatch covers, hatch cover stoppers, and shell plating. *See* Findings of Fact ¶¶ 44–73. Furthermore, Tecomar knew that these cracks were caused—at least in part—by the overflexibility of the ship. *Id.* ¶¶ 57–58, 60. Tecomar also knew about the TUXPAN's engine problems, as reflected by the many messages sent from the ship to Lopez informing him of the engine stoppages and gas leaks caused by the worn cylinders. *Id.* ¶¶ 74–91. Additionally, Tecomar decided to use a portable tool to machine the cylinders even though MAK had warned Tecomar that using such a tool was improper. *Id.* ¶¶ 81–82. As to the engine foundation bolts, Tecomar undoubtedly knew how frequently the bolts had come loose, and knew that the ship was not equipped with the proper wrench for tightening them. *Id.* ¶¶ 92–104. Tecomar also knew that the seawater cooling pipes were so worn that holes could easily be punched through them with a hammer. *Id.* ¶¶ 105–107.

Therefore, because the unseaworthiness of the TUXPAN was within Tecomar's privity and knowledge, its petition for limitation of liability pursuant to the Limitation Act is denied.

#### (b) Per Package Limitation

Under both COGSA and the Hague–Visby Rules, a carrier's liability for negligence is limited to a fixed sum per package trans-

ported. 46 U.S.C.App. § 1304(5); Hague–Visby Rules, Art. 4(5). Claimants argue, however, that Tecomar's failure to provide a seaworthy ship constitutes recklessness, and that therefore, the per package limitation should be denied. Since the Hague–Visby Rules differ from COGSA on this issue, the court will discuss them separately.

### (i) *The Hague–Visby Rules*

 As discussed *supra*, Tecomar's liability for the cargo that was loaded in Germany is governed by the Hague–Visby Rules as adopted and interpreted by the Federal Republic of Germany, and its liability for the cargo loaded in Belgium is governed by the Hague–Visby Rules as adopted and interpreted by Belgium. PTO at 100 (Pretrial Order, "Agreed Upon Issues of Law").

Both Germany and Belgium have adopted Article 4(5) of the Hague–Visby Rules, which is the provision which corresponds to COGSA's per package limitation. Unlike the COGSA, however, Article 4(5)(e) prohibits the package limitation from applying in cases of recklessness:

> Neither the carrier nor the ship shall be entitled to the benefit of the limitation of liability ... if it is proved that the damage resulted from an act or omission of the carrier done with intent to cause damage, or recklessly and with knowledge that the damage would probably result.[88]

 Although Article 4(5)(e) explicitly denies the package limitation to reckless shipowners, its meaning has not been interpreted by the courts of either country. *See* Tr. 2813–14, 2833. The language of Article 4(5)(e), however, is almost identical to that of Article 25 of the 1955 Hague Protocol to the Warsaw Convention ("the Warsaw Convention"), which governs the liability of air

carriers. *See* Tr. 2866–67. Since both Germany and Belgium are signatories to the Warsaw Convention, their interpretation of Article 25 is highly relevant to the meaning of Article 4(5)(e) of the Hague Rules. Pet. Post-trial Brief at 156–161; Cl. Post-trial Brief at 39–44; Tr. 2835–36, 2866, 2881–82. While there is no dispute that Article 25 requires both reckless conduct and knowledge on the part of the shipowner, the parties disagree as to whether the knowledge is actual or constructive. According to the cases which address this issue, both German and Belgian law construe Article 25 to require actual knowledge.

In the leading German case, the German Supreme Court stated that Article 25 requires actual rather than constructive knowledge, but that such knowledge can be inferred from the outward behavior of the actor. *See* Translation of Judgment of Feb. 16, 1979, Bundesgerichtshof, W. Ger., 1 ZR 97/77 ("Translation from German") at 1–2, 12 (docketed May 31, 1991); Tr. 2814–15, 2833–38. In that case, the court found that an airline, through its employees, did have actual knowledge that damage was likely to result from its actions. Translation from German at 12. Contrary to the airline's internal regulations, certain documents had been given to the chief flight attendant who—also contrary to the regulations—had stored them in a cloakroom instead of in the airplane's cargo compartment. *See id.* at 5; Tr. 2834. Upon arrival in Madrid, the documents could not be found. *See* Translation from German at 2; Tr. 2834. In denying the package limitation to the air carrier, the court reasoned that the flight attendant knew that the loss was likely to occur because she had been carefully instructed about the importance of the documents and nevertheless disregarded the airline's regulations that could have prevented the loss.[89] *See*

---

**88.** Although Belgium adopted the Hague–Visby Rules verbatim, Germany modified their language slightly when it incorporated them into its Civil Code ("the HGB"). Thus, Article 4(5)(e) of the Hague–Visby Rules appears as § 660(5) of the HGB, and provides that

> [t]he carrier loses its right to limitation of liability ... if the damage is caused by an act or omission which the carrier made with the

intention to cause a damage or which he made recklessly and with the knowledge that a damage will probably occur.

**89.** Furthermore, both parties' German law experts expressed the opinion that a German court would be even more willing to deny the package limitation to a carrier who recklessly disregarded the rules of its classfication society or of SOLAS. *See* Tr. 2836–38, 2825–26.

Translation from German at 12–13; Tr. 2815, 2836.

The Belgian Supreme Court, in the decision of the *Cour de Cassation* of January 27, 1977, also concluded that the knowledge articulated in Article 25 is actual rather than constructive. Translation of Decision of *Cour de Cassation*, Jan. 27, 1977, at 9 (docketed May 31, 1991). That case involved a pilot, whose airplane crashed into a mountain because he misconstrued the ambiguous directions of an air controller. *Id.* at 3–4. In granting the package limitation, the court concluded that the pilot was completely unaware of the error he had made, and thus, did not possess the actual knowledge that damage was likely to result. *See id.* at 12.

This case, however, does not merely involve one isolated misjudgment, but rather, involves a continuous course of reckless conduct by a shipowner who was well aware of the risks created by its actions.[90] In violation of the rules of its classification society and of SOLAS, Tecomar not only failed to disclose the problems with the TUXPAN and the TUMILCO, but also affirmatively concealed information it knew was relevant to the vessels' seaworthiness.[91] Findings of Fact ¶¶ 46–49, 54, 63–73, 91, 104. In March 1986, Tecomar failed to inform a GL inspector that cracks in the tanks of the TUMILCO had been repaired, and instead, directed the inspector to test tanks which had no history of defects. *Id.* ¶ 63. In April 1986, Tecomar moved the TUXPAN from one port to another in the middle of a GL inspection in order to perform last-minute repairs to her tanktops. *Id.* ¶¶ 64–65. In an effort to repair cracks on the TUMILCO, Tecomar worked through the entire night on the eve of the ship's GL inspection, and yet did not inform GL of these new repairs. *Id.* ¶ 66. In

November 1986, Tecomar went so far as to memorialize its concealment in writing by sending a message to the TUMILCO's captain stating, "It is not advisable that GL see that we are making repairs on the tank tops." *Id.* ¶ 70. Furthermore, Tecomar—through Technical Director Lopez—was fully cognizant of how important the regulations of GL and SOLAS were to the safety of its ships, as well as their cargo and crew. Lopez was not only Tecomar's Technical Director, but had also received an advanced degree in naval mechanical engineering, had served in the Merchant Marine, and possessed several naval engineering licenses. Tr. 957–58. He was well versed in all the maritime regulations which affected Tecomar's ships, and knew that failure to comply with these regulations would create a substantial risk to the vessels, their cargo, and their crew. Nevertheless, Lopez chose to conceal the TUXPAN's numerous and recurring problems—problems which he knew would substantially increase the liklihood of damage to a ship crossing the winter North Atlantic. Indeed, the surreptitious repairs performed on the TUXPAN in April 1986 evidence how far Lopez was willing to go in order to mislead its own classification society.

The court concludes, therefore, that under both German and Belgian law, Tecomar acted recklessly in failing to provide a seaworthy ship, with knowledge that damage would probably result. Accordingly, the package limitation on Tecomar's liability for the cargo loaded in Germany and Belgium and destined for Mexico is denied.

### (ii) COGSA

▮▮ COGSA provides that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation

---

90. In general, "recklessness" consists of acting in disregard of a high and excessive degree of danger, which is either known or apparent to a reasonable person under the circumstances. *See* W. Prosser & W. Keeton, The Law of Torts § 34, at 213–14 (5th ed. 1984) [hereinafter Prosser & Keeton].

91. Although the following discussion refers in part to the TUMILCO, these references are relevant only insofar as they indicate a general pattern of recklessness on the part of Tecomar. Thus, even without this information, the court would still conclude that Tecomar was reckless in its maintenance of the TUXPAN.

of goods in an amount exceeding $500 per package...." 46 U.S.C.App. § 1304(5). Nevertheless, Claimants present a novel legal argument as to why COGSA's per package limitation should not apply to Tecomar. Claimants assert that subsequent to the enactment of COGSA, courts have continued to apply the principles of general maritime and contract law, except where Congress has explicitly abolished those principles. Cl. Post-trial Brief at 49–50. As an example, Claimants point to the doctrine of deviation—a general maritime concept which courts in this circuit continue to apply.[92] *See Jones v. The Flying Clipper*, 116 F.Supp. 386, 389–91 (S.D.N.Y.1953) (unauthorized ondeck stowage is an unreasonable deviation which nullifies COGSA's per package limitation); *Encyclopedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7 (2d Cir.1969) (adopting *The Flying Clipper*), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). Claimants conclude that since COGSA is silent on the issue of recklessness, the court should follow the common law principle that a shipowner may not contractually limit its liability for damages caused by its own reckless conduct. Cl. Post-trial Brief at 50.

 Although Claimants' argument is cogent, the Second Circuit decided the issue of a shipowner's liability for recklessness under COGSA in *Iligan v. Integrated Steel*

*Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68 (2d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975).[93] The cargo claimants in *Iligan* argued that the doctrine of deviation should include a shipowner's gross negligence or wilful misconduct in failing to provide a seaworthy ship.[94] *Id.* at 71–72. The court, however, rejected this argument, reasoning that to hold otherwise would require the courts to determine in almost every case the degree of the carrier's culpability, "with enormous potential liability ... riding on the decision of the fact finder." *Id.* at 72. Furthermore, the court was concerned not only with the difficulty in determining a carrier's culpability, but also with the economic impact of such a rule. The court pointed out that "it is more practical and economical from the point of view of insurance to spread the risk to the cargo in excess of a fixed limit among a number of cargo insurers rather than to concentrate it in the carrier's [protection and indemnity] insurer." *Id.* at 73 (quoting Diplock, *Convention and Morals—Limitation Clauses in International Maritime Conventions*, 1 J.Mar.L. & Comm. 525, 528–29 (1970)). Subsequently, other courts in this circuit have adopted *Iligan*'s reasoning. *See B.M.A. Industries, Ltd. v. Nigerian Star Line, Ltd.*, 786 F.2d 90, 92 (2d Cir.1986) ("[o]ur court repeatedly has declined to ex-

**92.** A deviation is "any departure by a vessel from the customary voyage without reasonable cause or an action that tends to increase the risks associated with shipping goods." Note, *Deviation and the Package Limitation in the Hague Rules and the Carriage of Goods by Sea Act: An Alternative Approach to the Interpretation of International Uniform Acts*, 68 Tex.L. Rev. 977 (1990). At common law, an unreasonable deviation was a gross breach of contract which resulted in the carrier losing the protection of any limitation of liability provided for in the bill of lading. *Id.* COGSA, however, provides that "in any event" the carrier's liability will be limited to $500 per package. Thus, a split in the circuits arose as to whether Congress intended to abolish or retain the common law doctrine of unreasonable deviation. *Id.* at 987. The Seventh Circuit interpreted COGSA's "in any event" literally, thereby holding that the liability of a carrier for damaged cargo is always be limited to $500 per package. *See Atlantic Mutual Ins. Co. v. Poseidon ·Schiffahrt*, 313 F.2d 872 (7th Cir.), *cert. denied*, 375 U.S. 819, 84

S.Ct. 56, 11 L.Ed.2d 53 (1963). The Second Circuit—whose approach later became the majority rule—reasoned that Congress intended to retain the common law doctrine, and held that an unreasonable deviation vitiates COGSA's per package limitation. *See Jones v. The Flying Clipper*, 116 F.Supp. 386 (S.D.N.Y.1953); *Encyclopedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7 (2d Cir.1969) (adopting *The Flying Clipper*), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).

**93.** Claimants dismiss the *Iligan* court's discussion of this issue as "pure dictum." Cl. Post-trial Brief at 52–53. On the contrary, the conclusion in *Iligan* was "an alternative ground of decision," and as such, is binding on this court. *Iligan*, 507 F.2d at 70.

**94.** The analysis in *Iligan* implicitly includes "recklessness," since "willful," "wanton," and "reckless" are essentially synonymous when denoting aggravated degrees of negligence. *See* Prosser & Keeton, § 34, at 211–14.

tend the doctrine of deviation on the basis of culpability or crime"); *Norwich Union Fire Ins. v. Lykes Bros. S.S. Co.*, 741 F.Supp. 1051, 1055 (S.D.N.Y.1990) (doctrine of deviation is not to be extended based upon carrier's culpability).

In attempting to distinguish *Iligan*, Claimants argue that because there is no claim of deviation against Tecomar, *Iligan*'s reasoning does not apply to this case. This distinction, however, is primarily semantic: regardless of whether this is a deviation case, Claimants make the identical argument that the Second Circuit rejected in *Iligan*, i.e., that a carrier who recklessly breaches its statutory duty to provide a seaworthy ship should not benefit from the statute's package limitation.

Claimants also argue that as a matter of public policy, COGSA's package limitation should not apply to a carrier such as Tecomar, whose reckless conduct causes the loss of life and property. Although the court agrees that the law should deter this kind of behavior, the court must follow the dictates of *Iligan*.[95] Accordingly, since COGSA governs the cargo loaded in Germany and Belgium and bound for the United States, Tecomar's liability for that cargo is limited by COGSA's per package limitation as set forth in 46 U.S.C.App. § 1304(5).

## CONCLUSION

Tecomar's petition for limitation of liability pursuant to 46 U.S.C.App. § 183 is denied. Accordingly, Tecomar is liable to Claimants for the lost cargo, subject to a package limitation on the cargo loaded in Germany and Belgium and bound for the United States. 46 U.S.C.App. § 1304(5). The exact amount of damages will be deter-

mined in the second phase of the trial. *See* PTO at 105.

---

**95.** The court notes, however, that the law of this Circuit seems to have created an unjust paradox: a carrier who stowes cargo on deck without the shipper's authorization loses COGSA's per package limitation, *The Flying Clipper*, 116 F.Supp. at 389–91; and yet, a carrier who recklessly tenders an unseaworthy ship which consequently sinks with all its cargo and crew, gets the benefit of the package limitation. *See Iligan*, 507 F.2d at 71–73. In addition, a carrier who misrepresents the onboard status of the cargo in its bill of lading will lose COGSA's package limitation, regardless of whether the misrepresentation was fraudulent, *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841 (2d Cir.1985); and yet, a carrier who fraudulently misrepresents that its ship is seaworthy can successfully benefit from the package limitation. *See Iligan*, 507 F.2d at 71–73.